No. 47,716

KANSAS ASSOCIATION OF PUBLIC EMPLOYEES, *Appellant,* v. PUBLIC SERVICE EMPLOYEES UNION, LOCAL 1132, *Appellee,* and PUBLIC EMPLOYEE RELATIONS BOARD, STATE OF KANSAS, *Appellee-Intervenor.*

(544 P. 2d 1389)

Opinion filed January 24, 1976.

*K. Gary Sebelius,* of Eidson, Lewis, Porter and Haynes, of Topeka, argued the cause, and *William G. Haynes,* of the same firm, was on the brief for the appellant.

*Richard F. Calcara,* of Blake, Uhlig and Funk, of Kansas City, argued the cause, and *Robert E. Funk, Jr.,* of the same firm, was on the brief for the appellee, Public Service Employees Union, Local 1132.

*John A. McKinnon,* of Topeka, argued the cause and was on the brief for the appellee-intervenor, Public Employee Relations Board, State of Kansas.

The opinion of the court was delivered by

FOTH, C.: This is a dispute between two rival labor organizations over the right to represent an employee unit at the University of Kansas consisting of about 400 janitors, maintenance workers and repair personnel. On October 17, 1973, the state Public Employee Relations Board conducted an election among the employees in the unit to select a representative. Of the 297 valid ballots cast, 157 favored the appellee Public Service Employees Union, Local 1132, A. F. L.-C. I. O., while 99 favored the appellant Kansas Association of Public Employees (KAPE). Ten ballots were void, and 41 were cast for "no representation."

After the election the loser, KAPE, filed with the Board objections to the election and also a complaint charging the winner, Local 1132, with a "prohibited practice" under K. S. A. 1972 Supp. 75-4333 (c) (1), part of the 1971 public employer-employee relations act. Both the objections and the complaint were based on the same allegations of misconduct on the part of Local 1132 in conducting its election campaign.

The Board, through an examiner, conducted a full hearing on the objections and complaint. It filed findings of fact and conclusions of law finding KAPE's evidence insufficient to warrant setting the election aside or to sustain a "prohibited practice" charge. It therefore dismissed KAPE's objections and complaint. KAPE sought review of the Board's order in the district court of Douglas county under K. S. A. 1972 Supp. 75-4334 (b). That court upheld the order of the Board, and KAPE has appealed to this court.

KAPE's two points on appeal claim error in the trial court's holding that the Board's finding of no misconduct is supported by substantial evidence, as to both the election contest and the prohibited practice claim. Put another way, KAPE says the evidence of misconduct on the part of Local 1132 was so clear as to compel findings that the election was tainted and that the statute was violated.

The statute relied on, K. S. A. 1972 Supp. 75-4333 (c) (1), makes it a "prohibited practice" for an employee organization to "[i]nterfere with, restrain or coerce public employees in the exercise of rights granted in section 4 of this act." Section 4 (75-4324) basically guarantees to public employees the right to join and participate or not to join or participate in the activities of employee organizations formed to treat with their employers in matters of grievances and conditions of employment. The question before

the Board, then, was whether any conduct of Local 1132 could be said to have interfered with, restrained or coerced those voting at the representation election in the free and intelligent exercise of their choice of representative. If so, the conduct would be not only a "prohibited practice" but would presumably justify setting aside the election.

The conduct KAPE now relies on falls into two categories. First, it alleges that Local 1132 violated a pre-election agreement limiting the times and places of campaign activity. Second, it asserts that two campaign flyers distributed by Local 1132 were so misleading as to have deprived the voting employees of an informed choice. The Board found against KAPE on both issues, and the trial court found the Board's findings to be supported by the record.

Before proceeding to a review of the evidence, it is well to establish the scope of judicial review in this case. The review statute, K. S. A. 1972 (now 1975) Supp. 75-4334 (*b*), provides in pertinent part:

".  .  . Findings of the board as to the facts shall be conclusive unless it is made to appear to the court's satisfaction that the findings of fact were not supported by substantial evidence and the record considered as a whole."

We thus have an unequivocal statement that in reviewing the action of the Public Employee Relations Board the courts shall apply the customary standards for the review of the acts of an administrative agency. The leading case on that issue is *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, 436 P. 2d 828, where we said:

"A district court may not, on appeal, substitute its judgment for that of an administrative tribunal, but is restricted to considering whether, as a matter of law, (1) the tribunal acted fraudulently, arbitrarily or capriciously, (2) the administrative order is substantially supported by evidence, and (3) the tribunal's action was within the scope of its authority." (Syl. ¶ 1.)

In *Foote* we also summed up this court's role on appellate review:

"In reviewing a district court's judgment, as above, this court will, in the first instance, for the purpose of determining whether the district court observed the requirements and restrictions placed upon it, make the same review of the administrative tribunal's action as does the district court." (Syl. ¶ 2.)

KAPE suggests that the statutory language making factual findings of the Board binding on the courts only if supported by substantial evidence "and the record considered as a whole" requires some different type of judicial review. It asserts that a reviewing

court should look not only at the evidence supporting the Board's findings but also at that which might lead to contrary findings, and thereafter strike a balance. The notion that a reference to the "record as a whole" requires a court to indulge in this kind of "weighing of the evidence" in reviewing an administrative decision was recently rejected in *Graves Truck Line, Inc., v. State Corporation Commission*, 215 Kan. 565, 527 P. 2d 1065. The court there noted that "[t]he facts that are to be considered and the relative weight to be given them in making a determination are matters left to the Commission's discretion." (P. 570.) Appellants there relied on a statement in *Rock Island Motor Transit Co. v. State Corporation Comm.*, 169 Kan. 487, Syl. ¶ 4, 219 P. 2d 405, that "[i]n the determination of the question whether such an order of the commission is unlawful or unreasonable the district court necessarily must *review the entire record, weigh the evidence, and base its decision upon all of the facts* and circumstances shown therein." (Emphasis added.)

In *Graves* we made it clear that "[t]he *Rock Island Motor Transit* case should not be construed to permit a district court in the review of an administrative order to determine the weight and credibility of the testimony of any witness. If some significance need be given the language in the *Rock Island Motor Transit* case, as to the right to weigh evidence, it must be limited to *a review of the entire record to determine if there was substantial competent evidence* to support the findings of the Commission." (P. 571. Emphasis added.) In *Graves* we noted that the testimony of the witnesses supporting the appealed order contained "several contradictory statements." We nevertheless said that "it was within the province of the Commission to weigh such testimony and select that which it considered most reasonable." (*Ibid.*)

So here, under the statute governing review of an order of the Public Employee Relations Board, the district court had a duty to consider the "record as a whole" in its search for "substantial evidence." On the other hand, it had no duty or even right to weigh conflicts in the evidence or to substitute its judgment for that of the Board, and it carefully avoided doing so. The same limitations, of course, apply to this court on appellate review.

We turn, then, to the evidence before the Board dealing first with the alleged violations of the pre-election agreement on times and places of campaign activity. The background of the agreement is basically undisputed:

University officials called a meeting for September 15, 1973, to review pre-election procedures. KAPE, Local 1132, and university officials were present, but the Board was not a party to the meeting or represented. Local 1132 had previously filed a complaint against the university which had resulted in a Board decision that the university was guilty of a "prohibited practice" by interfering with the local's organizational efforts. The result had been a letter from the university's attorney to supervisory personnel, instructing them to demonstrate good faith neutrality. It made clear that organizational activities could be conducted by any organization during employees' "free time," which was defined as including "lunch breaks, and, of course, an employee is on free time before clocking in and after clocking out." Athough the letter did not purport to establish campaign rules, the parties orally agreed to abide by its terms and also agreed not to campaign on the day of the election.

On the morning of the election the Board called a meeting of all parties. The only discussion of campaign limitations at this time was the Board's admonition against any campaigning near the polling place. KAPE raised no complaints concerning any campaign violations at that time, but now relies on two alleged breaches of the September 15 agreement.

The first occurred at about 9:45 a. m. the day before the election, when the business agent for Local 1132, Lloyd Rose, spoke with several employees in the McCollum Hall dining area. The dormitory director testified to observing Mr. Rose speaking with six employees while they were on a coffee break. Mr. Rose freely admitted having a short conversation with the group after posting a flyer on the bulletin board, but said he presumed they were on their lunch break, as they were eating sandwiches and drinking coffee. Another employee, Evelyn Dines, testified, however, that no employee is scheduled to have lunch prior to 11:00 a. m. No testimony was offered to indicate what effect, if any, this coffee break meeting had on the votes of the six employees or on the outcome of the election.

The other claimed breach of the pre-election agreement was based on Mrs. Dines' testimony that she observed two men, one of whom she identified as Kenneth Brohart, distribute handbills at the buildings and grounds office prior to 6:00 a. m. on the day of the election. Mr. Brohart, who was a university employee but

not a representative of Local 1132, agreed that he had distributed handbills prior to the election, but did not believe he had done so on the morning of the election.

As to Mr. Rose's contact with the six employees during a coffee break, the Board found that it occurred but attributed no significance to it. It reasoned that: "While agreements reached between the parties prior to the election on these issues are of probative value in determining whether a prohibited practice has occurred, they are not determinative of the issue. The same can be said of rules unilaterally established by the employer relative to working-time contacts with employees, use of bulletin boards and access to employer controlled property."

We agree. "It has long been the rule in this jurisdiction that in challenging the results of an election plaintiffs must plead and prove the irregularities complained of changed the result of the election. [Citing cases.]" (*Bishop v. Sewer District No. 1*, 184 Kan. 376, 382, 336 P. 2d 815.) Under this rule merely technical violations of procedural rules governing elections will not require setting an election aside; some substantial effect on the outcome must be shown. This being so even where the procedures are prescribed by statute, the rule would apply *a fortiori* where there is only an informal agreement. Here, assuming Mr. Rose was wrong in thinking the employees' coffee break was their lunch hour, or even that he deliberately breached the agreement, it is apparent that the vote of the six employees wrongfully approached could not have "changed the result of the election."

As to the alleged distribution of handbills on the morning of the election, the Board found that one flyer was distributed "as late as" the day before the election. This allegation was encompassed in KAPE's filed objection No. 5. As to it the trial court found: "The evidence in support of KAPE's objection number 5 is conflicting and the Board had to weigh this evidence to arrive at its conclusions." The Board's finding is thus conclusive that no campaigning took place on the morning of the election. Even if it did, there is absolutely no evidence that any representative of Local 1132 participated in such campaigning, much less that it interfered with the employees' right of franchise, or that it affected the result of the election.

KAPE's second allegation of misconduct centers on two flyers used as campaign material by Local 1132. The first (Exhibit No. 1)

dealt with negotiations just completed between Local 1132 and the University of Kansas Medical center. It was as follows:

"750 MEDICAL CENTER WORKERS
KNOW A GOOD THING
THEY CHOSE—LIU
Highlights of Benefits Won by Local 1132
After Many Hard Negotiation Sessions
Medical Center Agrees to Recommend:
5—10—15% INCREASES
GRIEVANCE PROCEDURE
CALL-IN PAY
WAGE RE-OPENER
SHIFT PREFERENCE
SENIORITY RIGHTS
STEWARDS RIGHTS
VOTE LIU
PUBLIC SERVICE EMPLOYEES LOCAL 1132
A GOOD THING FOR *YOU*"

KAPE claims this was misleading, first because the agreement reached by Local 1132 with representatives of the medical center was subject to approval by the state department of administration, which approval was unlikely; and second, because the full wage increases claimed by the flyer would be realized by only a small portion of medical center employees.

As to this flyer the Board's finding of fact was that "The University agreed to recommend benefits substantially equivalent to those stated on the fac[e] of Complainant's Exhibit #1."

There was no question but that the medical center representatives did agree to "recommend" the benefits, as is shown by the memorandum of agreement between Local 1132 and the medical center. The wage increases were also to be recommended, although not contained in the memorandum of agreement and not to be applicable to all employees across the board. The Board's conclusion on this flyer was:

". . . Respondent in the instant case, circulated material clearly designed to influence support for it and away from Complainant. From the record, however, it cannot be concluded that this material, admittedly propaganda, was intentionally designed to misrepresent facts as viewed by Respondent. Certainly the record discloses that management representatives at KU Medical Center did agree to 'recommend' a four-point program for benefits for KU Medical Center employees. These points were concededly 'won' by Respondent at the meet-and-confer sessions held in Kansas City. Whether they were formally spelled out in the Memorandum of Agreement (Complainant's Exhibit # 3) is not material to the determination of this case."

The second flyer (Exhibit No. 5) depicted a ventriloquist's dummy marked "KAPE" sitting on the knee of a balding gentleman marked "University Administration." After asking "Whose voice is speaking," the copy went on to say:

"The Boss Pulls the String and KAPE Talks

Bosses like 'Charlie McCarthy' unions. These are phoney unions that are dominated by management—like KAPE. They are also called 'Company Unions' (and they are outlawed in the private sector). The boss likes them because its the surest way to make you think you have union protection and security, without ever granting you real protection and security.

Here's What the Labor Board Said about KAPE

The Kansas Public Employee Relations Board recently noted 'the overall structure . . . of KAPE differs from that of traditional labor organizations' because its *membership includes a substantial number of managerial, professional and supervisory personnel* at the University, including the Vice Chancellor himself!!!

Join a *Real* Union

Vote for Public Service Local 1132

Laborers' International Union of North America, AFL-CIO"

KAPE's basic complaint about this piece of literature is that the quotation from the Board's prior decision, admittedly accurate, is taken out of context "so that the average reader would believe that the Board had held KAPE to be an illegal or outlawed employee organization when, in truth, the Board held that KAPE was a valid and legal employee organization under the Act."

The Board's finding on this score was:

". . . Of all of the material distributed by Respondent, Complainant's Exhibit # 5 is the most aggressive. We find, however, from a review of the record that this material would reasonably be regarded by employees as mere propaganda. Employees must be presumed to have sufficient knowledge of existing conditions and of the nature of competing organizations so as not to be materially misled, especially in the absence of a showing that the material had a significant impact on the election. The record in this case is void of any such showing."

We agree. KAPE does not contend that the quoted characterization by the Board is inaccurate, *i. e.,* that it does not have as members "managerial, professional and supervisory personnel," including the Vice Chancellor. Nor does it contend that it is wrong to say its structure "differs from that of traditional labor organizations." That is all we read into the quoted material. It carefully points out that "company unions" are outlawed "in the private sector." The rhetoric about a "company union" versus a "real

union" is just that, and we think would be so taken by the average reader.

It is not necessary, however, for this court to determine the effect of either flyer. The trial court found that "[t]he evidence and record indicate that the question as to whether KAPE's Exhibits 1 . . . and 5 would constitute misrepresentations . . . could lead reasonable minds to different conclusions." This is another way of saying that an administrative determination either way would not be arbitrary or capricious. The trial court therefore properly deferred to the judgment of the Board.

KAPE cites us a number of decisions under the National Labor Relations Act to the effect that material misrepresentations, particularly concerning wages won by a union in other contracts, made just prior to a representation election when the opponent has no opportunity to refute them, may constitute such an interference with the voting employees' free choice as to require setting the election aside. Our act, in K. S. A. 1975 Supp. 75-4333 (e), points to the "fundamental distinctions" between private and public employment and admonishes us that "no body of federal or state law applicable wholly or in part to private employment shall be regarded as binding or controlling precedent." We nevertheless see no reason why the rule announced in the federal cases should not be applicable to a representation election among public employees—it is a rule of fundamental fair play, and should be universally applicable. It is but one facet of our own election contest rules exemplified by *Bishop v. Sewer District No. 1,* supra.

The trouble here is that the facts do not bring the rule into play in this case. Whether Local 1132's wage claims or its characterization of KAPE as a "company union" were material misrepresentations, or indeed misrepresentations at all, were questions of fact. The trial court found room for a reasonable difference of opinion, and so do we. We cannot say as a matter of law that the statements were so misleading as to have inevitably affected the outcome of this rather decisive election.

The Board's position is summed up in three sentences from its order:

"The Act and Public Employee Relations Board rules contemplate a degree of campaigning on the part of participants competing for representation status."

"The Public Employee Relations Board views its function in the conduct of elections as assuring to the employees involved an opportunity to cast their

ballots in an atmosphere free of elements which prevent or impede a reasoned choice."

". . . While the Board in an appropriate case would not hesitate to set aside a representation election on the basis of misconduct of the parties prior to or during the election, it will not do so on the basis of the record before it in the instant case."

It seems to us the Board has thus correctly characterized its role in the election process and reached the proper result on the record. The trial court so found, saying:

"A review of the entire record in this case does not indicate any misconduct of Local 1132 prior to or during the election that would, as a matter of law, constitute conduct requiring that the election be set aside as an interference with public employees in the exercise of rights granted by K. S. A. 1973 Supp. 75-4324."

We concur, and therefore affirm.

APPROVED BY THE COURT.

FATZER, C. J., and SCHROEDER, J., dissent.