No. 49,483

RICHARD GORHAM and ALFONSO SANCHEZ, *Appellees,* v. CITY OF KANSAS CITY, KANSAS, *Appellant.*

(590 P.2d 1051)

Opinion filed February 24, 1979.

*John J. Jurcyk, Jr.,* of McAnany, Van Cleave & Phillips, P.A., special counsel for the City of Kansas City, Kansas, argued the cause, and *Donald E. Martin,* city attorney, *Jay D. Justice,* assistant city attorney, *Richard W. Noble, Jack L. Campbell,* and *W. Terrence Kilroy,* of Shughart, Thomson & Kilroy, a Professional Corporation, special labor counsel for the City of Kansas City, Kansas, were with him on the brief for the appellant.

*J. R. Russell,* of Kansas City, argued the cause and was on the brief for the appellees.

*Richard B. Thompson,* of Blake & Uhlig, of Kansas City, was on the brief *amicus curiae* for the Fraternal Order of Police Lodge No. 4, and *Frank A. Bien,* of Topeka, was on the brief *amicus curiae* for the League of Kansas Municipalities.

The opinion of the court was delivered by

MILLER, J.: The City of Kansas City, Kansas, the defendant below, appeals from the judgment of the Wyandotte district court, ordering the reinstatement of the plaintiffs, two Kansas City, Kansas police officers, Patrolman Richard Gorham and Sergeant Alfonso Sanchez. Stated simply, the issues before us are whether the officers had constitutionally protected rights in continued employment with the City and, if so, whether those rights were honored, waived, or violated.

The City of Kansas City, Kansas, through a majority vote of its governing body on October 2, 1975, elected to bring the City under the provisions of the Kansas Public Employer-Employee Relations Act, K.S.A. 75-4321 to 4337, inclusive. Following an election, the Fraternal Order of Police Lodge No. 4, was on November 4, 1975, certified by the Kansas Public Employee Relations Board as the exclusive bargaining representative for all patrolmen, detectives, and sergeants of the Kansas City, Kansas Police Department. The Lodge and the City conferred and reached an agreement, which was reduced to writing and set forth in a Memorandum of Understanding, which was in turn approved by a majority vote of the members of the Lodge in November, and was adopted by the City in December, 1975. Plaintiff Gorham was a patrolman, and plaintiff Sanchez a sergeant, on the Kansas City, Kansas Police Department, at all times here material. Both were members of the Lodge.

Articles 14 and 15 of the Memorandum of Understanding read as follows:

"ARTICLE 14: DISCIPLINE

"The Lodge recognizes that the Chief has the responsibility for maintaining discipline and the efficient and orderly operation of the Department. Accordingly, the authority to discipline officers is vested exclusively in the Chief. However, the Chief may from time to time delegate this authority to subordinate officers above the rank of Sergeant. The Lodge shall be notified in writing of the extent of the delegation and the rank of the officers in whom the delegated authority is vested.

"Officers, excluding probationary officers, shall only be disciplined or discharged for just cause. Discipline or discharge for cause shall include, but shall not be limited to, discipline or discharge for violation of Department Rules and Regulations, General or Special Orders.

"An officer may be suspended for up to four (4) days without being afforded an opportunity to protest the suspension prior to its implementation. Suspension of over four (4) days shall not be effectuated without the officer being allowed to protest the suspension prior to implementation. Prior to any officer being discharged, he shall be placed on suspension during the pendency of any protest of the proposed discharge.

"ARTICLE 15: GRIEVANCE PROCEDURE

"In the event of any complaint or grievance arising under the terms and provisions of the Memorandum or of any differences between the parties as to the interpretation or application of this Memorandum, it shall be processed through the grievance procedure. There shall be no right of grievance as to any subject properly falling within the management rights of the City or the Police Department. . . .

"The parties shall make sincere and determined efforts to settle meritorious grievances at the voluntary steps of the grievance procedure . . . .

. . . .

"Step 4. If no settlement is reached by the procedure above outlined, the matter shall be referred to the Grievance Board, hereinafter described, for settlement. . . . References to the Grievance Board shall be made jointly by the parties within seven (7) work days after Step 3 or be considered as having been dropped. The Grievance Board shall be composed of three (3) duly designated Lodge representatives (or alternates); and three (3) duly designated Department representatives (or alternates) of the rank of Lieutenant or above, selected by the Chief. The respective members of the Joint Board shall be appointed effective January 1, of each year and shall serve for one (1) year. The Grievance Board shall meet promptly upon call but in any event not later than fifteen (15) days after the grievance has been referred to it. *A majority vote of the Grievance Board on a grievance shall be final and binding on both parties.* The deliberations of the Grievance Board shall be confidential. The parties will be advised of the vote of the Grievance Board on a particular grievance, but the manner in which the individual members voted shall not be announced." (Emphasis supplied.)

The Memorandum of Understanding was effective throughout the calendar years 1976 and 1977.

On March 20, 1976, Officer Gorham and Sergeant Sanchez, both of whom were off duty, were apprehended by officers of the Kansas City, Kansas vice squad at a "smoker" where felony violations of the gambling laws were occurring. Gorham and Sanchez were relieved of their police commissions on the spot, and both were ordered to report to the Chief on the following Monday, March 22, 1976. On that date the Chief suspended both officers. He handed each of them a letter stating in substance that each officer had violated three specific sections of the Departmental Rules and Regulations; that such conduct constituted a major violation; and that "effective March 20, 1976, your employment will be suspended and effective March 30, 1976 your employment will be terminated."

Promptly, and within 48 hours after receiving the letter from the Chief, both officers requested a hearing before the Grievance Board. The Board, composed of three members designated by the Chief and three members designated by the Lodge, met on April

8, 1976. Gorham and Sanchez appeared in person at the hearing and each was represented throughout the proceedings by an attorney. Opportunity was given to plaintiffs' counsel to cross-examine the City's witnesses, and plaintiffs each had the opportunity to testify and to present evidence and witnesses on their behalf. The Board found both officers guilty of violating the three designated departmental rules; it reduced the penalty as to Officer Gorham to suspension for the period of one year, but let stand the penalty (termination of employment) as to Sergeant Sanchez.

Plaintiffs then each filed a Notice of Claim with the City, and when those claims were denied, plaintiffs filed actions, later consolidated, seeking reinstatement and back pay, asserting that each was wrongfully discharged in violation of his right to due process. Both sides moved for summary judgment, and the trial court sustained the motion of plaintiffs and entered summary judgment for them. In its comprehensive memorandum decision, the court found that plaintiffs were both beyond the probationary period, and that both were vested with a property interest in continued employment which could not be taken away without due process. The court cited and relied upon *Wertz v. Southern Cloud Unified School District*, 218 Kan. 25, 542 P.2d 339 (1975); *Stout v. Whiteaker*, 379 F. Supp. 218 (M.D. Tenn. 1974); *Board of Regents v. Roth*, 408 U.S. 564, 33 L.Ed.2d 548, 92 S.Ct. 2701 (1972); *Perry v. Sindermann*, 408 U.S. 593, 33 L.Ed.2d 570, 92 S.Ct. 2694 (1972); and *Endicott v. Van Petten*, 330 F. Supp. 878 (D. Kan. 1971). The trial court also found that plaintiffs also had a "liberty interest" in their good names, reputations, honor, and integrity which was entitled to due process protection.

The trial court found that the Lodge as a collective bargaining agent could not waive its members' right to due process; that there was no voluntary or knowing waiver by plaintiffs of their right to due process; that no waiver could be inferred by their mere acceptance of benefits under the memorandum or by requesting a hearing before the Grievance Board; and that the tender of a hearing *after* discharge does not fulfill the constitutional requirement of due process. Finally, the court found that the Grievance Board, composed as it was by police officers, all of whom were subject to being disciplined by the Chief of Police, was thus subject to command influence and does not meet the

requirements of an impartial forum. The court ordered reinstatement of both plaintiffs and payment of accrued pay, less earnings of the plaintiffs through outside employment in the interim. This appeal followed.

We turn first to the question of whether plaintiffs had a "property interest" in continued employment with the Kansas City, Kansas Police Department, or a "liberty interest," either of which was entitled to due process protection.

The fundamental principles applicable emanate from two United States Supreme Court cases, *Board of Regents v. Roth*, 408 U.S. 564, and *Perry v. Sindermann*, 408 U.S. 593. Justice Fromme, speaking for a unanimous court in *Wertz v. Southern Cloud Unified School District*, 218 Kan. 25, thoroughly examined the *Roth-Perry* dictates. Wertz, a non-tenured public school teacher who was fired without notice or hearing in the middle of his contract year, brought an action in the district court requesting reinstatement with pay and damages for wrongful discharge in violation of his constitutional right to due process under the Fourteenth Amendment. This court found both a property interest and a liberty interest deserving of due process protection. The teacher's interest in continued employment under his contract was the property interest, and the stigma which attaches to a midyear dismissal of a teacher for incompetence was the liberty interest. We held that Wertz, in the absence of any showing of extreme circumstances, was entitled to a due process hearing before his termination, and since he was deprived of such a hearing, he was entitled to recover back pay from the time of his wrongful discharge until the expiration of his contract.

Unlike Wertz, plaintiffs Gorham and Sanchez had no written contract of employment for a definite term; but both had been employed by the City as policemen for some years, and under the Memorandum of Understanding, neither could be discharged except for just cause. We have held that where discharge is "for cause," notice and hearing is required. *Will v. City of Herington*, 201 Kan. 627, 443 P.2d 667 (1968). In *Wichita Council v. Security Benefit Ass'n*, 138 Kan. 841, 28 P.2d 976 (1934), we discussed "cause." We said:

"The word 'cause' . . . means what is sometimes spoken of as legal cause, or just cause, a substantial, reasonable or just cause, related to matters of a substantial nature pertaining to duties or obligations imposed. [Citations omitted.]

"The word carries with it the necessity of an appropriate charge, or accusation,

notice of the charge with an opportunity to present a defense, and a fair hearing before an official or tribunal authorized to conduct such a hearing, and a decision on the merits of the charge." (p. 846.)

In *Lindley v. State Board of Administration,* 117 Kan. 558, 231 Pac. 1026 (1925), we recognized the distinction between being removable at will, and being removable only for cause.

The terms of the Memorandum of Understanding confirmed a valuable right of the police officers of Kansas City, Kansas: they may be removed from office *only* for cause of a substantial nature. As this court said in *Amalgamated 1360 v. Topeka Transp. Co. Inc.,* 200 Kan. 29, 35, 434 P.2d 850 (1967), "The essence of a collective bargaining agreement is to provide terms and conditions of employment, *and job security for employees."* (Emphasis supplied.) The Memorandum before us performed that vital function; it provided for job security. Plaintiffs had a legitimate claim of entitlement to continued employment, absent a showing of just cause, under the express provisions of the collective bargaining agreement. This constitutes a property right.

The sudden discharge of a police officer, and particularly an officer with a number of years of service with the department, without announcement of the cause of such action, could well injure the reputation and good name of the individual officer in the community. We need not decide whether the "liberty interest" of the plaintiffs was sufficient to raise a due process claim, however, since we have found a "property interest" and thus an entitlement to due process.

A determination that plaintiffs were entitled to due process, however, is as we observed in *Wertz,* "only preliminary to determining the extent of the protection to be accorded or in determining whether a waiver of due process has occurred." (218 Kan. at 31.)

Article 14 of the Memorandum of Understanding recognizes the responsibility of the Chief to maintain discipline, and his authority to discipline the members of the force for cause. The last paragraph of Article 14 provides in substance that when the Chief suspends officers for not more than 4 days, such suspension becomes effective immediately and no hearing need be held prior to the effective date of the suspension. When, however, the suspension is for *more* than four days, the officer must be allowed to protest the suspension before it becomes effective.

We pause to note that the article does not differentiate between suspension *with* pay and suspension *without* pay. Since suspension from duty *with* pay involves no serious deprivation of property or liberty rights, we conclude that when Article 14 speaks of suspension "for up to four (4) days" or "suspension of over four (4) days," the article speaks of suspension *without* pay. The public interest requires that a police department have the authority to temporarily suspend officers immediately from duty; such temporary suspensions, pending investigation or hearing, are suspensions from duty and not suspensions from the payroll, and they violate no constitutional right of the officers.

Under Article 14, when an officer is to be suspended for more than 4 days, his protest must be heard before the suspension is effective. Likewise, when an officer is to be discharged, Article 14 provides that he shall be placed on suspension during the pendency of any protest. The clear import of this article is that if the disciplined officers wish a hearing, they may have one before suspension of more than four days or before discharge can be effected. Meanwhile, they may be relieved of duty temporarily, without loss of pay. The Chief of Police did not discharge plaintiffs forthwith; he placed each on suspension temporarily before the proposed termination of employment was to become effective, in order that a hearing before the Grievance Board could be requested if desired. When hearings were requested, the Chief's order for termination was suspended and both officers remained on temporary suspension until the Board acted. If no protest was lodged, then the Chief's order for termination would have taken effect without a hearing.

Do the provisions of Article 14 and 15 constitute an effective waiver of pre-suspension or pre-termination hearings, required before property rights may be divested? We hold that they do. The question of whether a bargaining agent for public employees may waive rights of the represented employees has not been decided in the cases involving the Kansas Public Employer-Employee Relations Act which have previously come before us. See *Liberal-NEA v. Board of Education,* 211 Kan. 219, 505 P.2d 651 (1973); *National Education Association v. Board of Education,* 212 Kan. 741, 512 P.2d 426 (1973); *Kansas Ass'n of Public Employees v. Public Service Employees Union,* 218 Kan. 509, 544 P.2d 1389 (1976); *State, ex rel., v. Bennett,* 219 Kan. 285, 547

P.2d 786 (1976). The Court of Appeals had no occasion to consider the issue in *Coggins v. Public Employee Relations Board*, 2 Kan. App. 2d 416, 581 P.2d 817 (1978), *rev. denied* 224 Kan. clxxxvii (September 13, 1978).

We turn first to examine the pertinent statutes. The purpose of the Act, as stated in K.S.A. 75-4321(*b*), is:

"[T]o obligate public agencies, public employees and their representatives to enter into discussions with affirmative willingness to resolve grievances and disputes relating to conditions of employment, acting within the framework of law. It is also the purpose of this act to promote the improvement of employer-employee relations within the various public agencies of the state and its political subdivisions by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice, or to refrain from joining, and be represented by such organizations in their employment relations and dealings with public agencies."

Once the public employer decides to be covered by the Act, K.S.A. 75-4321(*c*), and a majority of the employees of the unit elect to be represented by an employee organization, K.S.A. 75-4327(*d*), the formally recognized employee organization is granted exclusive recognition to represent all of the employees in the unit. K.S.A. 75-4328. A majority of the employees having voted in favor of representation, *all* are represented—whether they be members of the employee organization or not, and whether or not they agree with all of the policies, acts, and contracts of the employee organization. The basic bargaining tool is the Memorandum of Agreement, K.S.A. 75-4330, which may extend in scope to all matters relating to conditions of employment except five areas specifically excluded by that section. Grievance procedures may be included. K.S.A. 75-4330(*b*).

The City argues that the officers' remedy, in case of a claim for wrongful discharge, is provided in the agreement, and that remedy is a hearing before the Grievance Board; that plaintiffs should be limited to that remedy, which was bargained for by the Lodge, and is provided by contract; and that plaintiffs should have no recourse to the courts for wrongful termination because recourse has been provided before the Board pursuant to the terms of the memorandum. Thus the City contends that the memorandum is binding upon all parties, and whatever rights plaintiffs have to due process is limited by the memorandum; their rights absent any collective bargaining agreement have been waived.

Few cases have considered waiver of employee's individual

rights by a collective bargaining unit; but those we have found support waiver. Perhaps the leading case is that of *Antinore v. State of New York,* 49 App. Div. 6, 371 N.Y.S.2d 213 (1975), *aff'd* 40 N.Y.2d 921, 358 N.E.2d 268 (1976). Antinore, a tenured public employee who was suspended without pay pending removal proceedings resulting from charges of misconduct, contended that the grievance procedure provided in the collective bargaining agreement denied his constitutional rights to a pre-suspension hearing, and that he had not waived his constitutional rights. The court held that parties to collective bargaining agreements are free to agree to procedures for the resolution of disputes in a manner which dispenses with constitutionally guaranteed rights. It said:

" 'Parties in voluntary agreement are not limited, except for rare matters contrary to public policy, from agreeing to anything they wish  . . . .

". . . CSEA, as designated bargaining agent for a group of public employees in which plaintiff was included, was agent for plaintiff, such that its assent to the agreement was plaintiff's assent. '*  *  *(T)he union represents all the employees as to all covered matters'  . . . . The fact that this plaintiff did not himself approve the agreement negotiated by his representative and now-disclaims satisfaction with one aspect of the agreement makes it no less binding upon him. Labor relations involving any sizeable group cannot be expected to proceed only with the consent of each member of the group. Orderly process requires that agreements be made and complied with even in the face of minority dissent or disapproval. Plaintiff, as employee, has the benefits of the contract; he must accept also what he may regard as the disadvantages, for in the bargaining process it may well be that the latter were assumed in exchange for the conferral of the former. If plaintiff or others in his unit are dissatisfied with their agent's product, there are means available to effect a change in representation and certification  . . . . Meantime, he can no more claim exemption from the negotiated agreement than may a citizen, with impunity, withhold compliance with a statute because he disfavored his legislator's affirmative vote on the enactment.
 . . . .
"In the present case, however, we do not perceive that a waiver of plaintiff's individual constitutional rights incidental to a procedure for removal from his employment contravenes any public policy such that the waiver should not be given effect. Indeed, far from violating public policy, the binding arbitration procedures provided by the agreement between the State and CSEA must be viewed as advancing the public good by the expedition of the resolution of disciplinary disputes in a simpler, more prompt manner than would attend their disposition by one of the methods provided by sections 75 and 76 of the Civil Service Law." (pp. 10-11.)

See also *Gupta v. Boyer,* 55 App. Div. 2d 1024, 391 N.Y.S.2d 255 (1977); *Board of Ed. of City of Rochester v. Nyquist,* 62 App. Div.

265, 404 N.Y.S.2d 710 (1978); *Williams v. Trans World Airlines,* 149 N.J. Super. 585, 374 A.2d 486 (1977); *Cary v. Bd. of Ed. of Adams-Arapahoe, Etc.,* 427 F. Supp. 945 (D. Colo. 1977).

The collective bargaining agreement before us in this case provided for a prompt hearing before the Grievance Board by any aggrieved employee. The Board was not the authority bringing the charges or taking the original action; it could reverse the original decision, find that no rule violation had occurred, restore the officers to duty without loss of pay, or make such decision as it found to be just. Its action was prompt and final. In this instance it held a full and fair hearing, and made a final decision within 20 days of the occurrence. This court proceeding has extended over a period of almost three years, and has obviously been much more expensive to the parties.

We hold that a public employee representative can by contract effectively waive the constitutional rights of the represented employees, so long as the negotiated agreement provides fair, reasonable and efficacious procedures by which employer-employee disputes may be resolved. The Memorandum of Understanding contained reasonable and workable provisions for the protection and enforcement of the officers' rights, and we hold that it waived the technical rights of the employees, all of whom were bound thereby. The memorandum does not contravene public policy, and is not challenged on that ground.

Finally, we turn to the question of whether the Grievance Board is an "impartial forum." The trial court said:

"[E]ach member of the Board was under the direct supervision and control of the chief in the performance of their police duties. Chief Meyers was directly responsible for the appointment of one-half of the Board. The chief had the sole authority to discipline those members of the Board that he did not directly appoint.

"It may well be that Chief Meyers did not and could not influence the decision of the Grievance Board. However, it is also apparent that a police chief, determined to have his decision to discipline an officer sustained, could exert sufficient pressure upon such a constituted board that would materially influence its decision.

. . . .

"This court does not believe that the procedures adopted for the selection of the Grievance Board were sufficient to meet the requirements of an impartial forum."

The issue squarely presented is whether the fact that a chief of police may appoint all or part of a police discipline board denies an accused officer the right to a hearing before an impartial

tribunal. Appellees concede that there was no evidence in this case that the police chief exerted any influence on the joint grievance board. In *Smith v. Miller,* 213 Kan. 1, 10, 514 P.2d 377 (1973), we impliedly recognized that in the absence of evidence of actual personal bias or partiality it is generally presumed that the decision makers will act upon the evidence and be impartial. The United States Supreme Court in *Hortonville Dist. v. Hortonville Ed. Assn.,* 426 U.S. 482, 492-493, 49 L.Ed.2d 1, 96 S.Ct. 2308 (1976) addressed the issue of whether a school board, responsible for negotiating a labor agreement with the district's teachers, could impartially conduct a hearing to adjudicate the correctness of its own decision to terminate striking teachers. The *Hortonville* court held that it could; that there was no showing that the board members "had the kind of personal or financial stake in the decision that might create a conflict of interest, and there is nothing in the record to support charges of personal animosity"; and that "[m]ere familiarity with the facts of the case gained by an agency in the performance of its statutory role does not . . . disqualify a decision-maker." The court found there must be a showing that the decision-maker is not "capable of judging a particular controversy fairly on the basis of its own circumstances." The mere fact the board members were involved in the events preceding the decision was not enough to overcome the presumption of honesty and integrity in those hearing the dispute. In *Wertz v. Southern Cloud,* 218 Kan. 25, we recognized that a teacher was entitled to a hearing before an impartial tribunal before dismissal, and we implied that the school board would be empowered to hear the matter.

*Hoyt v. Police Comm'r,* 279 Md. 74, 367 A.2d 924 (1977), is squarely in point. There, a Disciplinary Hearing Board composed of three senior officers first heard the disciplinary matters and made formal recommendations to the police commissioner as to the discipline to be imposed. The police commissioner, in whom ultimate disciplinary authority was vested by law, then accepted, modified, or rejected the punishment recommended. The court approved this procedure in the absence of any showing of bias, personal or financial stake in the decision, personal involvement in the strike which precipitated the charges, or that the police commissioner's views so clearly infected the actions of the board as to influence its decision.

In the case before us, the only facts shown are that the Chief, in whom disciplinary authority was vested, appointed three members of the Grievance Board, and that the other three members were appointed by the Lodge. There was no evidence and there is no claim of bad faith, undue influence, personal interest, conflict of interest, bias, or personal animosity. One who challenges the impartiality of a board or hearing officer has the burden of proof on that issue. The facts before the trial court do not show anything but good faith on the part of the Chief and the board. The trial court's suggestion that the Chief could exert sufficient pressure on the board to materially influence its decision is not based upon facts within the record. There is no claim and no showing that the Chief ever attempted to exert such influence. We hold that the procedures established by the Memorandum of Understanding for the selection of the Grievance Board are adequate and that the record fails to establish any partiality or unfairness whatsoever on the part of the board.

For the reasons stated, the judgment is reversed and remanded, with directions to enter judgment for the defendant and appellant, City of Kansas City, Kansas.