**John M. WARREN, Plaintiff,**

v.

**CITY OF JUNCTION CITY, KS., Defendant.**

No. 01–2110–JWL.

United States District Court, D. Kansas.

Oct. 26, 2001.

Michael E. Francis, Alan V. Johnson, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, for Plaintiff.

Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, for Defendant.

### MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

Former Chief of Police John Warren filed suit against the City of Junction City ("the city") alleging that the steps taken by the city in terminating his employment were improper. The plaintiff asserts two theories of recovery under 42 U.S.C. § 1983. He alleges his termination deprived him of both property and liberty interests without comporting with the constitutional requirements of procedural due process. He also asserts a state law breach of contract claim. Before the court

is the defendant's summary judgment motion (Doc. 25). The motion is granted as to the property interest and state law breach of contract claims because Kansas law forecloses a city manager from entering into an implied contract and, in the alternative, the plaintiff fails to raise a genuine issue of material fact as to whether an implied contract was formed. The motion is denied as to the liberty interest claim because there is a genuine issue of material fact whether the city, in the course of its termination proceedings, adopted allegations published in a local newspaper that stigmatized the plaintiff, and which the plaintiff alleges are false.

### I. Facts

The plaintiff was hired as the Junction City Chief of Police on October 7, 1996 by City Manager John Hepler. Throughout his employment, Junction City was a city of the first class with a city manager form of government established pursuant to K.S.A. § 12–1036b. On September 30, 1996, just before being hired, the plaintiff signed a form acknowledging that he received a copy of the *Personnel Policies and Guidelines* of the City of Junction City. The personnel manual contains three relevant sections: (1) the purpose section; (2) the grievance procedure section; and (3) the rules of conduct section. The purpose section explicitly states the city's policy that employment is at-will and may be terminated without cause and that nothing in the manual is intended to change that policy.

Mr. Hepler, his successor as city manager, Mr. Barnes and the plaintiff all testified that it was their custom to use the *Personnel Policies and Guidelines*. Both Mr. Barnes and Mr. Hepler point out, however, that a department head had not been disciplined under their tenures. The plaintiff also added that the human re-

sources director told him that he could only terminate employees for cause. He further recalled that around the time he was hired, he asked Mr. Hepler for a contract. The plaintiff remembers Mr. Hepler's response as: "And he told me as long as I was doing my job and receiving good evaluations I wouldn't have to worry about a contract, I would be employed as the chief of police." Mr. Hepler did not contest the statement, but he did not remember making it.

The events which gave rise to the initiation of this lawsuit began in the summer of 1999 when several Citizens National Bank ("CNB") employees started to question the police department's investigation of one of their employees, Pete Arceo. Although it is not clear whether it was Bruce Woner, an attorney apparently hired by CNB, or Ed Rolfs, Sr. of CNB, one of the two met with Mr. Hepler in the summer of 1999 and told him that if the detective in charge of the Arceo case and the chief of police were not terminated, the city would be sued. In response, Mr. Hepler requested that the Kansas Attorney General investigate the Junction City Police Department ("JCPD").

On August 6, 1999, the first of several newspaper articles was published regarding the Arceo investigation. In the coming months, approximately 17 articles would be published. They all centered on one of the following: the Arceo case, a Grand Jury investigation of one of the detectives on the Arceo case, the JCPD, or the termination of the plaintiff.

On August 16, 1999, in the middle of the Arceo controversy, Mr. Hepler resigned as the city manager. Mr. Barnes became the interim city manager the next day. He was later named to the position permanently in February of 2000. The plaintiff recalled that on his first day as interim city manager, Mr. Barnes met with the

department heads and he told them, "everything was staying the same."

In the fall of 1999, the scrutiny of the JCPD began to widen from just the Arceo investigation to the department as a whole. On October 4, 1999, attorney Bruce Woner sent a 51–page packet ("the Woner report") to each of the City Commissioners, the Mayor, and the City Manager. The packet contained, among other things, an Investigation Summary Relating to Arceo and the Junction City Police Department, dated October 1, 1999, of unidentified origin but "directed to the criminal defense team of Pete Arceo." Following receipt of the Woner report, Mr. Barnes and City Engineer Tom Neal (as a witness) met with Mr. Woner and two CNB representatives. The CNB team briefed Mr. Barnes on what they perceived to be the problems with the JCPD and they explained that they hired an investigative agency of retired police officers, Kelley & Associates, to prepare the October 1, 1999, summary that was part of the Woner report.

Several days after meeting with the CNB team, Mr. Barnes had a meeting with the City Commission. No action was taken. A few days later, however, Mr. Barnes wrote a letter to the plaintiff placing him on administrative leave pending the outcome of an investigation of the police department. At that time, Mr. Barnes informed the plaintiff of the allegations contained in the Woner report. In response to the allegations, on October 14, 1999, the city hired PSI, an agency run by a retired Highway Patrolman and a former police officer from Salina, to investigate the allegations against the plaintiff and the JCPD.

At some point after PSI was hired, City Commissioner Bill Levinson gave his copy of the Woner report to the press. *The Daily Union*, a Junction City newspaper, published a story on October 24, 1999,

related to the hiring of PSI to investigate the allegations against the JCPD. The story summarized the allegations against the plaintiff that were set out in the Woner report. The story included the following allegations against the plaintiff: (1) he mismanaged the police department and ignored possible crimes; (2) he selectively enforced the law in three different investigations; (3) he obstructed justice in a claim filed by a police officer while the claim was being investigated by the Kansas Bureau of Investigation; (4) he unequally enforced policies regarding romantic relationships within the department; (5) he intimidated contract negotiators for a police union; and (6) he mismanaged the Arceo investigation.

On December 23, 1999, PSI concluded its investigation of the plaintiff and the JCPD. They submitted a report to Mr. Barnes. Mr. Barnes and the plaintiff met on January 4, 2000. Mr. Barnes terminated the plaintiff in a letter delivered that day. The letter did not give a reason for the plaintiff's termination. The plaintiff asked Mr. Barnes why he was terminated, and Mr. Barnes replied, "I said I did not think his management style would mesh with mine and I no longer needed his services."

Later that day, Mr. Barnes prepared a press release and gave it to the local newspapers. *The Daily Union* and *Topeka Capital–Journal* printed a paraphrased version of the release within the next few days. *The Daily Union* article dated January 4, 2000, stated that plaintiff's termination was not directly related to the city's investigation, but Mr. Barnes would not give a reason for the termination. The *Topeka Capital–Journal* article quoted Mr. Barnes as saying: "It's action that we took, that we felt was necessary, as a result of things that have occurred at the police department." Following the plaintiff's termination, he made a number of efforts for a grievance hearing. Mr. Barnes denied all of the plaintiff's attempts. Apparently in response to one of the plaintiff's requests for a grievance hearing, Mr. Barnes sent an additional letter to the plaintiff on January 11, 2000 which stated:

Your termination from employment with the City of Junction City was accomplished under our policy that the employment relation between the City and any employee is that of "at-will." Your termination was not a result of misconduct on your part as contemplated by the Grievance Policy cited in your letter but rather was done for the reason stated in my letter to you on January 4, 2000.

Following his termination, the plaintiff lived in Junction City until July of 2000. He applied for the position of Shawnee County Sheriff but withdrew his name for reasons unrelated to his experience in Junction City. He also applied for a number of positions in Michigan and Wisconsin but was denied the job because the prospective employers could not understand that he could be terminated without good cause. Effective July 1, 2000, the plaintiff became the Director of Police and Campus Safety at Washburn University.

## II. Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable

substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, the movant may simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

### III. Due Process

 The plaintiff alleges that his termination did not comply with the constitutional requirement of procedural due process. The Fourteenth Amendment's procedural due process protections apply only to an individual deprived of a recognized property or liberty interest. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

A procedural due process claim involves a two-step analysis: "(1) did the individual possess a protected interest such that the due process protections were applicable; and if so, then (2) was the individual afforded an appropriate level of process." *Farthing v. City of Shawnee,* 39 F.3d 1131, 1135 (10th Cir.1994) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985)). In this case, the plaintiff received no process. Thus, to decide whether the defendant's motion for summary judgment should be granted as to the plaintiff's claim for lack of procedural due process, the court must determine whether the plaintiff possessed either a property or liberty interest.

### A. Property Interest

 Property interests are not created by the due process clause of the Constitution. *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. Instead, they "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* A public employee has a property interest in continued employment if, under state law, that employee has not merely a "unilateral expectation," but instead, "a legitimate claim of entitlement" to continued employment. *Id.* If an employee bases an expectation of continued employment on an implied employment contract, then the court relies on state contract law to determine whether there is a legitimate claim to continued employment under the contract. *Carnes v. Parker,* 922 F.2d 1506, 1510 (10th Cir.1991).

 Under Kansas law, public employment is presumptively at-will, and a public employee terminable at-will does not possess a protected property interest for due process purposes. *Farthing,* 39 F.3d at 1136 (citing *Stoldt v. City of To-*

*ronto,* 234 Kan. 957, 678 P.2d 153 (1984)). If an employee is terminable for cause, however, then the employee has a property interest in continued employment. *Id.* (citing *Gorham v. City of Kansas City,* 225 Kan. 369, 590 P.2d 1051 (1979)).

The plaintiff argues that there is evidence sufficient to create a genuine issue of material fact whether he had an implied contract for continued employment with the city. The defendant resists the plaintiff's assertion that a factual question exists by arguing Kansas law precludes a city manager from entering into an implied contract with an employee of a city that has a city manager form of government. The defendant also contests the plaintiff's assertion that there is evidence in the record to support a finding that an implied contract existed. The court agrees with the defendant on both accounts.

### 1. Kansas Law Precludes An Implied Contract

The issue of whether under Kansas law a city manager working under a city manager form of government is permitted to enter into an implied contract with an employee was previously decided by this court in *Cragg v. City of Osawatomie, Kan.,* No. 95–2492–JWL, 1996 WL 707108 (D.Kan. Nov. 8, 1996), *partially rev'd on other grounds,* 143 F.3d 1343 (10th Cir.1998). In that case, this court approved the reasoning in *Dehart v. City of Manhattan,* 942 F.Supp. 1395 (D.Kan. 1996), and the Kansas Court of Appeals cases cited therein. In *Cragg,* this court stated: "Reading *Riddle* and *Wiggins* together, then, Kansas law gives a city manager the power to remove employees without cause, and that power cannot be abridged by contract, implied or written, because the city manager lacks the authority to enter into a contract of employment for a specific term." 1996 WL 707108, at *6. Similarly, in *Dehart* Judge Rogers stated: "The implication ... is that in cases

where K.S.A. 12–1014 applies an employee is foreclosed under Kansas law from asserting a property interest based upon either a written contract or an implied contract." 942 F.Supp. at 1399. Five years have passed since the decisions, and the Kansas Supreme Court has not been called upon to address the issue. This court still believes that if the Supreme Court did so it would arrive at this same conclusion.

The plaintiff argues to the contrary for three reasons. First, the plaintiff argues that the holding in *Riddle* regarding a city manager's ability to enter into an implied contract was dicta because the city's rules and regulations were not in the record. Second, the plaintiff argues that *Wiggins* should be limited to the proposition that a housing authority, under K.S.A. § 17–2340, lacks the power to enter into implied contracts and not extended to a city manager under K.S.A. § 12–1014. Finally, the plaintiff argues that *Dehart* did not consider *Hall v. City of Wichita,* a 1924 Kansas Supreme Court case the plaintiff alleges stands for the proposition that a city manager can enter into an express or implied contract. 115 Kan. 656, 223 P. 1109 (1924). The court is not persuaded by the plaintiff's three arguments to change its position on this issue.

The plaintiff's argument that the language in *Riddle* stating that a city manager cannot enter into an employment contract for a term was dicta may be valid but that does not change the reasoning or holding in *Dehart.* As the court pointed out in *Dehart,* prior to *Wiggins,* other Kansas courts had not read *Riddle* for the proposition that a city manager cannot enter into an implied contract with an employee. The court's analysis on that aspect of *Riddle* was ignored until the Kansas Court of Appeals readdressed the issue in *Wiggins.* The court's clarification of the *Riddle* holding in *Wiggins*

provides the basis for the holdings in *Cragg* and *Dehart.*

The plaintiff is also correct in pointing out that the holding in *Wiggins* involved K.S.A. § 17–2340, not K.S.A. § 12–1014, the relevant statute in this case. Nonetheless, the holding in *Wiggins* is broad and applies equally to K.S.A. § 12–1014. As this court explained in *Cragg, Wiggins* suggests that a public employee serves at the will of his or her employer. *Cragg,* 1996 WL 707108, at *6 (citing *Wiggins v. Housing Authority of Kansas City, Kan,,* 916 P.2d 718, 722 (1996)). Thus, the holding applies to all public employees regardless of the governing statute.

Finally, the court disagrees with the plaintiff's reliance on *Hall.* In *Hall,* the plaintiff was a police officer hired by the city manager of Wichita, a city organized under the city manager form of government under R.S. § 12–1001 [the predecessor to K.S.A. § 12–1014], for a term of one year. 223 P. at 1109. After a new board of commissioners was elected and the city manager resigned, the new city manager terminated the plaintiff's employment. *See id.* The plaintiff then sued the city for breach of contract. *See id.* The Kansas Supreme Court held the plaintiff's claim could not stand because any contract that existed expired when the previous city manager was terminated. *See id.* The court does not agree that *Hall* stands for the proposition that a city manager has the power to enter into contracts of employment. The Supreme Court was not confronted with that issue. In fact, that court's reference to Section 2 of Article 15 of the Kansas Constitution ("such office shall be held during the pleasure of the authority making appointment . . . .") leads this court to believe, in fact, that the Kansas Supreme Court would have decided this issue the same way this court did in *Cragg.* "During the pleasure" clearly denominates an at-will relationship. But the Kansas Supreme Court in *Hall* did not need to address that point and decided the issue on the narrower ground. Given the recent Kansas Court of Appeals' precedent and this court's previous holding in *Cragg,* the court is not persuaded to change its view that Kansas law forecloses a city manager from entering into an implied contract with an employee.

## 2. Evidence of an Implied Contract

■ Moreover, the plaintiff's due process claim cannot survive summary judgment even if a city manager could enter into an implied contract. The plaintiff has not carried his evidentiary burden to show that there are any triable issues of material fact to be resolved by a jury that such a contract existed.

■ The question of whether an implied contract exists under Kansas law is typically a question of fact for the jury. *Anglemyer v. Hamilton County Hosp.,* 58 F.3d 533, 537 (10th Cir.1995). Summary judgment is not precluded, however, where there is no showing of liability as a matter of law, where there are no essential facts in dispute, and where "the plaintiff presents only evidence of his own unilateral expectations of continued employment." *Kastner v. Blue Cross & Blue Shield of Kan., Inc.,* 21 Kan.App.2d 16, 894 P.2d 909, 916 (1995) (quoting *Conyers v. Safelite Glass Corp.,* 825 F.Supp. 974, 977 (D.Kan. 1993)); *see also Pilcher v. Board of County Comm'rs,* 14 Kan.App.2d 206, 787 P.2d 1204, 1207–08 (1990) (upholding directed verdict where the evidence was insufficient to create a disputed issue of material fact). The Kansas Supreme Court decision in *Morriss v. Coleman Co.* directs courts to look to the intent of the parties to decide if an implied employment contract exists:

Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the under-

standing and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

241 Kan. 501, 513, 738 P.2d 841 (1987). For an implied employment contract to exist, both parties must intend to enter into a contract with terms other than employment at-will. *See Allegri v. Providence–St. Margaret Health Center*, 9 Kan. App.2d 659, 684 P.2d 1031, 1033 (1984) ("A contract implied in fact arises from facts and circumstances showing mutual intent to contract.").

The plaintiff relies on three factors in support of his contention that the parties intended to form an implied contract for continued employment: (1) the defendant's *Personnel Policies & Guidelines* § 13.8; (2) the past business practices of the city; and (3) statements made to the plaintiff by the city managers.

On September 30, 1996, the plaintiff signed a form acknowledging he received a copy of the personnel policies and guidelines manual. The plaintiff also testified that over the course of his years of employment he had read the manual. Section 1.2 of the manual is titled Purpose of Rules and Regulations and states:

It is the purpose of these rules and regulations to set forth the principles and procedures which will be followed by the City of Junction City, Kansas, in the administration of its personnel program. The contents of this handbook are presented as a matter of information only. While the City of Junction City believes in the plans, policies and procedures described herein, they are not conditions of employment. The City of Junction City reserves the right to modify, revoke, suspend, terminate, or change any or all such plans, policies or procedures, in whole or in part, at any time, with or without notice. Employment with the City of Junction City, except for those employees under a collective bargaining agreement, is at the discretion of the City and the employee. Either party may terminate the employment relationship at will and without cause. Nothing in this employment manual shall be construed to create an implied or express agreement of employment, nor shall anything in this manual be construed as creating an express or implied covenant of good faith and fair dealing between the city and any employee. The rules of conduct found in Section 13 are promulgated to give employees notice of the conduct expected of them during their term of employment. They in no way expressly or impliedly create a contract or agreement for employment. Further, the grievance policy found in Section 12 is promulgated to provide policies and procedures to adjust grievances in a fair manner. The establishment of a grievance policy and procedures in no way will be construed to create an express or implied agreement of employment. The language used in this handbook is not intended to create, nor is it to be construed to constitute a contract between the City of Junction City and any one or all of its employees. Employment with the City of Junction City is for no definite period of time and the City can change wages, benefits, and conditions at any time.

Although Kansas courts have held that a disclaimer does not necessarily preclude the formation of an implied contract of

employment, *see, e.g., Morriss,* 738 P.2d at 849 (holding that a disclaimer in a supervisor's manual did not, as a matter of law, decide the issue of whether an implied contract of employment was formed), under the circumstances here, the court concludes that the disclaimer is dispositive of the question of whether the manual establishes any sort of intent to enter into an implied contract.

In *Morriss,* the court determined that the defendant had not established that the disclaimer had been brought to the plaintiff's attention or that the disclaimer was intended to create an unqualified employment-at-will relationship. *Id.* In *Kastner,* the Kansas Court of Appeals distinguished the facts in *Morriss* in holding that where the plaintiff admits reading a disclaimer contained in an employee manual which states that the policies of the manual are not intended to create an implied contract of employment, the disclaimer is dispositive of the question of whether the employer intended to form a contract with the plaintiff. 894 P.2d at 918–19. ("A more absolute declaration of intent on the part of [the employer] to create an unqualified employment at-will relationship is difficult to envision."). As in *Kastner,* here there is no dispute that the plaintiff read the language of the disclaimer over the course of his employment and the language of the disclaimer unequivocally establishes the defendant's intent to create at-will employment.

Despite the disclaimer, the plaintiff alleges that there is enough evidence to create a disputed issue of fact regarding whether the defendant intended to create an employment contract. The court does not agree. First, the plaintiff's reference to the *Personnel Policies & Guidelines* § 13.8 is not persuasive. Section 13.8 is entitled Dismissal and states:

A Department Head with the approval of the City Manager may dismiss for any reason an employee in his/her department.

1. A written statement of the reason for dismissal shall be prepared and furnished to the employee by the Department Head and a copy shall be filed with the City Manager.

The plaintiff alleges this section is intended to create a continued employment contract because this section states that a reason for dismissal must be given to the terminated employee. This assertion is problematic as it applies to the plaintiff. First, this section applies to a Department Head terminating personnel under him or her. The section does not indicate it applies to the city manager who is terminating a department head. Second, this section states an employee can be terminated for any reason.

The plaintiff next points to the business practices of city employees. Mr. Hepler and Mr. Barnes both testified that it was their custom and practice to use the *Personnel Policies & Guidelines* in handling disciplinary matters involving city employees. The plaintiff testified that he always used the *Personnel Policies & Guidelines* in handling disciplinary matters involving employees under his supervision. The plaintiff further testified regarding termination of an employee, "we were instructed ... by our human resources director and our city attorney that we could only do that with cause with any employee." Nevertheless, this use of the grievance procedure did not create a right to continued employment. First, the grievance procedure itself only addresses the mechanics of termination and does not guarantee an employee the right to continued employment. *See Asbill v. Housing Authority of Choctaw Nation,* 726 F.2d 1499, 1502 (10th Cir.1984) ("By themselves, however, these procedural protections [the grievance procedures] do not support 'a

legitimate claim of entitlement' to future employment."); *Carnes v. Parker*, 922 F.2d 1506, 1511 (10th Cir.1991) ("[P]rocedural protections themselves are not sufficient to create a property interest in continued employment...."). Second, both city managers testified that they had never fired a department head. Therefore, no precedent exists regarding the termination of department heads which might give rise to an inference that an implied contract of employment was intended based on past practices.

The plaintiff's testimony that he was told he could fire employees for cause only is equally unpersuasive. The plaintiff is a department head who is accountable to the city manager. The city manager is in a different situation because he or she has the final authority regarding termination. Moreover, even if the city managers had a history of not firing employees absent cause, this alone would be insufficient to show the existence of a contract with the plaintiff. *See Burke v. BDM Technologies, Inc.*, 1999 WL 40973, *3 (10th Cir. Feb. 1, 1999) ("As a matter of policy, this Court will not consider evidence that a company does not usually fire employees without a good reason as by itself establishing that the company does not maintain an at-will employment policy. To do otherwise would encourage employers to occasionally fire employees for no other reason than to show that they maintain the ability to do so.")

Finally, the plaintiff alleges that statements made by City Managers Hepler and Barnes created a contract for continued employment. The plaintiff testified Mr. Hepler told him around the time he was being hired that he did not need a written contract of employment because he would be employed as the chief of police as long as he was doing his job and received good evaluations. Mr. Hepler could not recall making the statement but did not doubt that he might have made it. The plaintiff alleges this statement created a contract for continued employment. To the extent Mr. Hepler may have intended to form an oral contract for continued employment with the plaintiff, however, the plaintiff's own case law certainly stands for the proposition that the contract would have ended when Mr. Hepler resigned. *Hall*, 223 P. at 1110. In that connection, the plaintiff alleges Mr. Barnes intended to renew Mr. Hepler's oral promise for continued employment when he started as interim city manager in August of 1999. The only evidence to support the plaintiff's assertion is his testimony that when Mr. Barnes started as interim city manager, he told the plaintiff and the other department heads that "everything was staying the same." This court does not believe that statement is sufficient to give rise to an inference from which a reasonable jury could conclude that Mr. Barnes intended to provide the plaintiff with a contract for continued employment. First, Mr. Barnes was not speaking directly to the plaintiff but to a group of department heads. Second, there is no evidence that Mr. Barnes knew of the previous oral statement by Mr. Hepler to the plaintiff nearly three years ago. This is not a situation where the plaintiff said to the city manager, "I negotiated a deal with the former city manager and we agreed that I could only be terminated for cause, do you agree to the same contract?" Instead, the plaintiff perceived he had a contract. Unilateral expectations of an employee are not evidence of an implied contract. *See Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 815 P.2d 72, 80 (1991) ("Such an agreement cannot be established solely by the employee's subjective understanding or expectation about his or her employment."); *Mid-West Painting, Inc. v. State of Kansas Employment Security Board of Review*, 26 Kan.App.2d 266, 984 P.2d 146,

149 (1999). To withstand a motion for summary judgment, the opposing party must provide some evidence establishing the existence of a disputed material fact. *Kastner,* 894 P.2d at 916. Here the plaintiff provides nothing more than his own expectation of continued employment with the defendant. Accordingly, the court finds insufficient evidence of an implied contract. The court concludes the plaintiff was an at-will employee and had no constitutionally protected property interest in continued employment with the City of Junction City.

### 3. Grievance Procedure

Independent of an implied contract for continued employment, the plaintiff also asserts that he was denied a property interest consisting of a contract right to a grievance procedure. The plaintiff alleges that the contract right to a grievance procedure arises out of the *Personnel Policies & Guidelines* § 12.1, which provides in pertinent part: "Grievance procedures will always be followed when the matter affecting employment involves a liberty interest of the employee."

■ Even assuming the plaintiff is correct and he was entitled to a grievance procedure, the court must first determine whether a contract right to a grievance procedure entitles the plaintiff to due process protection. The court holds that it does not. Although a grievance procedure may entitle the plaintiff to certain procedural protections, ·it does not create a property interest for due process purposes. *Asbill v. Housing Authority of Choctaw Nation,* 726 F.2d 1499, 1502 (10th Cir.1984); *Carnes v. Parker,* 922 F.2d 1506, 1511 (10th Cir.1991); *Dehart,* 942 F.Supp. at 1403; *Polson v. Davis,* 635 F.Supp. 1130, 1141 (D.Kan.1986). In sum, the plaintiff has failed to provide evidence

of a constitutionally protected property interest.[1]

### B. Liberty Interest

■ Plaintiff also alleges that the city violated his liberty interest because it publicized allegations about him in the course of his termination proceeding. The Tenth Circuit has held that a plaintiff-employee must make the following showing to state a claim for relief founded on a liberty interest:

> When a public employer takes action to terminate an employee based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee's standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities, a claim for relief is created.

*Garcia v. City of Albuquerque,* 232 F.3d 760, 772 (10th Cir.2000) (citing *Melton v. City of Oklahoma,* 928 F.2d 920, 926–27 (10th Cir.1991), *cert. den'd* 502 U.S. 906, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991)). In that connection, the Tenth Circuit imposed four requirements on a plaintiff-employee asserting a liberty interest claim:

> the plaintiff must prove that: (1) the defendant made a statement impugning his or her good name, reputation, honor, or integrity; (2) the statement was false; (3) the defendant made the statement in the course of termination proceedings or the statement foreclosed future employment opportunities; and (4) the statement was published.

*Garcia,* 232 F.3d at 772 (citing *Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504, 526 (10th Cir.1998)). The elements are not disjunctive and all four must be satisfied. *Melton v. City of Oklahoma,* 928 F.2d 920, 926–27 (10th Cir.1991). If all of the elements are established, "the Due Process

---

1. In light of this conclusion, the defendant is also entitled to summary judgment with re- spect to plaintiff's state law claim for breach of an employment contract.

Clause requires an adequate name-clearing hearing." *Tonkovich,* 159 F.3d at 526.

■ Plaintiff does not rely on a published statement made directly by the city impugning his good name. Instead, he relies on an adoption theory. He asserts that a reasonable jury could find that the city adopted stigmatizing allegations contained in a newspaper article summarizing the Woner report. The defendant urges the court to reject the adoption theory because the allegations in the newspaper did not come from the city, and the city never explicitly adopted them. The court agrees with the plaintiff and holds that a genuine issue of material fact exists regarding whether the defendant adopted stigmatizing statements in the course of the plaintiff's termination.

■ A review of the Tenth Circuit's opinions regarding the adoption theory provides context for analyzing this issue. In *Melton,* the court addressed the adoption theory. 928 F.2d at 930. It stated that "a distinction must be drawn between the mere reporting of a claim made by someone and the adoption of that claim as a basis for punitive action against a public employee." *Id.* Further, "the mere reporting of the defamatory accusations of a third party will not make governmental agencies or government officials liable for the deprivation of a protected liberty interest." *Id.* "That conclusion does not hold, however, if the government entity overtly or impliedly adopts those defamatory accusations as the basis for punitive action against an employee." *Id.*

In *Melton,* a majority of the court held that an officer terminated by the City of Oklahoma City did not have a claim for relief because the defamatory accusation that was published was not the basis for punitive action against him. *Id.* The published defamatory accusation came from the F.B.I. and it charged Officer Melton with perjuring himself. He was never charged with perjury by the city, however, and his employment with the city was terminated because he violated the police department's code of ethics. *Id.* at 928. Therefore, in *Melton,* the court held that there was no evidence that the city accepted or adopted the allegation that the plaintiff committed perjury. *Id.*

In contrast, the court in *McGhee v. Draper* applied the adoption theory and held that a factual question remained regarding whether a school board had violated the plaintiff's liberty interest by effectively creating and disseminating an allegedly false impression of the plaintiff. 564 F.2d 902, 909–10 (10th Cir.1977). In that case, the plaintiff was a teacher whose contract was not renewed after a series of school board meetings where allegations of impropriety were discussed. *Id.* Although the board never explicitly adopted any of the allegations or listed them as the cause for nonrenewal of the plaintiff's contract, the board publicly disseminated over 200 copies of the its minutes containing the allegations and discussions. *Id.*

This case is more like *McGhee.* First, the facts here are distinguishable from *Melton* because the city conducted an investigation regarding the allegations in the Woner report prior to deciding to terminate the plaintiff. Therefore, a reasonable jury could conclude that the defendant impliedly adopted the defamatory accusations as the basis for punitive action against the plaintiff. 928 F.2d at 930 (holding that adoption did not occur because the allegations that were made by an independent source were not the basis for punitive action taken by the city); *see also, Pike v. Gallagher,* 829 F.Supp. 1254, 1270 (D.N.M. 1993) (holding despite the fact the city did not state the reason the plaintiff was terminated, the logical inference from a newspaper article was the city adopted the published allegations attributed to other

sources and used them as the basis for terminating the plaintiff).

Moreover, the actions take by the city are similar to *McGhee.* Like the school board in *McGhee,* the city manager never explicitly adopted the allegations contained in the Woner report. But also like *McGhee,* a reasonable jury could find that the city impliedly adopted a third party's defamatory allegations about the plaintiff. The source that initiated the stigmatizing allegations was the Woner report. If the city had taken no action to give the appearance that it believed the allegations in the report to be true, the plaintiff would not have a claim. *See Lancaster v. Independent School District No. 5,* 149 F.3d 1228, 1235 (10th Cir.1998) ("The Supreme Court has 'rejected the theory that the mere fact of dismissal, absent some publicizing of the reasons for the action, could amount to a stigma infringing one's liberty." (citation omitted)). The defendant, however, took several steps that a reasonable jury could conclude were intended to adopt the allegations. First, after receiving the report, the city manager immediately placed the plaintiff on administrative leave. Second, a city commissioner gave his copy of the Woner report to the press. Such action led to the publication of a summary of the report in *The Daily Union* on October 24, 1999. Finally, and most importantly, City Manager Barnes was quoted in the *Topeka Capital–Journal* as stating that the plaintiff was fired "as a result of things that have occurred at the police department." In the absence of an explanation why the plaintiff was terminated that disavowed the allegations of the Woner report, and particularly in light of the city manager's statement, a reasonable jury could infer that the city relied on the accusations in the Woner report as grounds to terminate the plaintiff. The court is satisfied that this creates a genuine issue of material fact for a jury to decide.

The defendant contends that the city's decision to hire an independent investigator should cut off any inference that the city relied on the Woner report as the basis for punitive action. The question though is not whether the Woner report itself was the basis for punitive action. By having put the allegations contained in the Woner report out in the public and terminating the plaintiff without disavowing them, then even if the independent investigation concluded that the allegations were true, the city could still be found to have relied on those publicly disseminated allegations as the basis for terminating the plaintiff. The city cannot insulate itself from liability as a matter of law merely by conducting the investigation. If the city based the plaintiff's termination on matters turned up in the investigation and not on the allegations or if the investigation substantiated the allegations of the Woner report and it assists the city in persuading the trier of fact that those allegations were true, then the investigation is not without considerable significance. But, if the trier of fact finds the allegations unfounded and that the city based its action on them, then whether or not the city performed its own investigation short of a name clearing hearing would not necessarily protect it from liability.

In addition to establishing a jury question regarding whether the plaintiff adopted the allegations in the Woner report, of course, the plaintiff must prove that the statements the city adopted meet the four requirements of a liberty interest claim set out in *Garcia.*

### 1. Stigmatizing Statement

▪ The first requirement is that the city's statement must be stigmatizing to the plaintiff. *Garcia,* 232 F.3d at 772. Whether a statement is stigmatizing is a question for the court. *Melton,* 928 F.2d at 927–28. A statement is stigmatizing if

it involves accusations of dishonesty or immorality. *See Garcia*, 232 F.3d at 772 (citing *Melton*, 928 F.2d at 927). Most of the Tenth Circuit decisions related to employment are consistent with this analysis. *See, e.g., Ewers v. Board of County Comm'rs*, 802 F.2d 1242, 1249 (10th Cir. 1986), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 704, 98 L.Ed.2d 655 (1988), *reh'd on other grounds*, 874 F.2d 736 (10th Cir.1989) (charges that the employee "padded the books" and "dragged out" cooperative jobs stigmatizing); *Bailey v. Kirk*, 777 F.2d 567, 580 (10th Cir.1985) (accusation of misappropriation of police property sufficiently stigmatizing); *Garcia v. Board of Educ. of Socorro Consol. School Dist.*, 777 F.2d 1403, 1419–20 (10th Cir.1985), *cert. denied*, 479 U.S. 814, 107 S.Ct. 66, 93 L.Ed.2d 24 (1986) (claims that plaintiff caused low staff morale and that he was difficult to work with stigmatizing); *Walker v. United States*, 744 F.2d 67, 69 (10th Cir.1984) (per curiam) (charges that employee lied on employment form stigmatizing); *Lentsch v. Marshall*, 741 F.2d 301, 304 (10th Cir. 1984) (charges of dishonesty stigmatizing); *Miller v. City of Mission*, 705 F.2d 368, 373 (10th Cir.1983) (charges that police department "morale was very low, the officers do not respect the Chief and Assistant Chief," and "the department had deteriorated to an extent [sic] that the men felt that they could not work effectively with the Chief and Assistant Chief" stigmatizing).

■ Plaintiff points to statements in the Woner report which accused the plaintiff of "mismanaging the police department," "ignoring possible crimes," engaging in "selective law enforcement," "obstructing justice," "unequally enforcing policies," and "intimidating contract nego-

tiations." These statements question the plaintiff's honesty and integrity, and are stigmatizing.

### 2. False Statement

The second requirement is that the stigmatizing statement must be false. *Garcia*, 232 F.3d at 772. Plaintiff testified that he denied the truth of the allegations summarized in the October 24, 1999, article in *The Daily Union*. This creates a genuine issue of material fact for a jury to decide. Defendant's argument that the article was true because there were allegations against the plaintiff at that time is not persuasive. If the underlying information contained in those allegations was false, then the city created a false statement by relying on those allegations in terminating the plaintiff's employment.

### 3. Statement Made in the Course of the Termination Proceedings

The third requirement is that "the defendant made the statement in the course of termination proceedings or the statement foreclosed future employment opportunities." Id. The trier of fact could find under all the facts and circumstances of this case that the defendant adopted the allegations contained in the Woner report. There is evidence of the adoption when Mr. Barnes was quoted in the *Topeka Capital–Journal* stating that the city's action was in response to events that occurred at the police department. The defendant does not contest that Mr. Barnes' statement was made during the course of the termination proceedings.[2]

### 4. Published Statement

■ The final requirement a plaintiff-employee must meet is that the statement

---

**2.** Plaintiff also alleges that the defendant's statements foreclosed the plaintiff's ability to obtain employment for six months. The court does not reach this issue because the require-

ment is not conjunctive and it is clear that the stigmatizing remarks were made during the course of the termination proceedings.

was published. *Garcia,* 232 F.3d at 772. Here it is clear that the statements made in the Woner report were published in *The Daily Union* on October 24, 1999. The defendant's statement which could be construed as adopting these allegations was published in the *Topeka Capital–Journal* on January 4, 2000.

In sum, the plaintiff has come forth with sufficient evidence to create a genuine issue of material fact whether the defendant adopted a stigmatizing statement during the course of its termination proceeding and used that statement as the basis for its decision to terminate the plaintiff. The defendant concedes that little process was afforded to the plaintiff. He was not entitled to a hearing or news conference to rebut the allegations against him. Accordingly, the defendant's motion for summary judgment is denied as to the plaintiff's procedural due process claim based on a liberty interest.

IT IS THEREFORE ORDERED BY THE COURT THAT the defendant's motion for summary judgment is granted in part and denied in part.