Susan CLAMPITT, Appellant,

v.

AMERICAN UNIVERSITY,
et al., Appellees.

No. 07–CV–143.

District of Columbia Court of Appeals.

Argued June 12, 2008.

Decided Sept. 25, 2008.

Larry P. Rothman, Washington, for appellant.

Steven R. Semler, Washington, with whom W. Gregory Mott, was on the brief, for appellees.

Before RUIZ and THOMPSON, Associate Judges, and FARRELL, Associate Judge, Retired.*

THOMPSON, Associate Judge:

After appellant Susan Clampitt was terminated from her position as Executive Director of WAMU, a public radio station owned and operated by American University, she sued the University and its then-President Benjamin Ladner, alleging

---

* Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

breach of employment contract; tortious interference with contract; breach of the duty of good faith and fair dealing; defamation; and a refusal by the University to pay her for accrued but unused vacation benefits. The trial court dismissed all the claims, either on the pleadings or on summary judgment. Clampitt appeals from the orders of dismissal and also seeks review of the trial court's order declining to compel production of a certain document that the University withheld on the ground that the document is attorney work product. We affirm the trial court's rulings as to all claims except the defamation claims against the University and Ladner. We reverse as to the dismissal of those claims, concluding that Clampitt is entitled to present them to a jury.

## I.

We briefly summarize the pertinent facts in the light most favorable to Clampitt, relying primarily on the documentary evidence and Clampitt's deposition. This is appropriate because, for purposes of review of an order granting summary judgment, we are to view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (in considering a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the non-moving party's] favor").

The University hired appellant to be the Executive Director and General Manager of WAMU in the Spring of 2000, after conducting a nation-wide search to fill the position. Clampitt alleged in her Amended Complaint and stated in her deposition that during a meeting with then-President Ladner in the spring of 2000, Ladner told her that he wanted to hire a general manager who would make a long term commitment to the station and asked for assurances from Clampitt to that effect. Clampitt, who was fifty-nine years old at the time, told Ladner that if she should get the job, she intended it to be the "capstone of her long career" and the job she would have until she retired. After Ladner offered Clampitt the position, Clampitt met with the University's Vice President of Enrollment Services, Tom Myers, to discuss the terms of employment.[1] Clampitt testified that she asked Myers for a guarantee by the University, in exchange for her willingness to take the job at a lower salary than she had sought, that she could remain in the position until she chose to retire from it, which she expected to be when she could transition to "full" Social Security benefits. Clampitt testified that Myers told her that he could not put such an assurance in writing, but also told her, "you can retire when you're ... in your 70's." Thereafter, Clampitt left her position as an Assistant Administrator of the General Services Administration and abandoned all other job search activities to accept the position at WAMU. She received an April 24, 2000 letter confirming the terms of her employment.[2]

1. Ladner had told Myers that he would "deputize Tom Myers to do the negotiating with" her.

2. The April 24, 2000 letter stated that Ladner offered Clampitt the position of Executive Director and General Manager of WAMU "according to the following terms: (1) Your employment will begin on June 15, 2000, with an annual salary of One Hundred Fifty Thousand Dollars ($150,000). (2) You will report to Mr. Tom Myers, Vice–President of Enrollment Services. (3) You will be entitled to other benefits for full-time staff in accordance with

Soon after her arrival at the station, Clampitt launched an effort to improve station operations in order to increase the size of the listening audience and to attract new and larger contributions from donors. The budgets that she proposed called for use of the station's cash reserves to finance improvements, a strategy that would require the station to incur operating deficits in the initial years. On September 12, 2000, Ladner specifically approved a spending plan that acknowledged that while "reserves are not meant to cover budget deficits," use of reserves to enable the station to invest in fundraising, marketing, programming and salary increases could "cover[ ] overexpenditures and produce larger revenue streams in the future." Clampitt testified that "[t]his is something that President Ladner and I did together, and he signed off on everything."

During Clampitt's tenure at the station, listenership and overall revenues grew significantly, foundation revenue increased substantially, and the station and Clampitt won many awards and recognition. In his annual performance review of Clampitt dated September 10, 2001, Myers said that he would recommend Clampitt for "the highest merit raise possible." In his review dated August 26, 2002, Myers stated that he was pleased with Clampitt's accomplishments and thanked her for her "excellent work during this past year." On August 13, 2003, Myers wrote that he was "pleased with [Clampitt's] performance and management during these trying times."

But station revenues were not as high as expected, in part because investments were not generating the "return that was hoped for" and because of a database problem that hampered fundraising ef-

forts, and "it was very hard to get ahead" because the fees that WAMU had to pay to the University were very high. At a meeting in June 2003, one of the station's talk show hosts, Diane Rehm-who, Clampitt testified, was unhappy with a number of programming and staff changes that Clampitt had made and set about "sowing dissension among the staff against" Clampitt—"stood up in a meeting ... and said that [Clampitt] had squandered the station's money." Also in June 2003, a group of WAMU donors and supporters wrote a letter to Ladner asserting that the "current management's spending is out of control" and expressing alarm at "significant financial losses at the station over the last three years that endanger the station's viability." At a meeting in July 2003, Ladner "expressed ... that he wanted a balanced budget in two years."

On October 20, 2003, the *Washington Post* published a story about WAMU, stating that "[a]fter years of balanced budgets—even financial surplus—the nonprofit [station] has been awash in red ink, with large operating deficits in each of the last three years and an emergency cash fund that has been depleted of millions of dollars." [3] The article also reported that major donors had appealed to Ladner, demanding explanations.

Clampitt asserts that neither Ladner nor the University made any effort to inform the public that the University had specifically approved Clampitt's financial and budgetary recommendations. Instead, Clampitt asserts, she was "scapegoated." On October 30, 2003, Ladner met with Clampitt to inform her that he was terminating her employment. He gave her a termination letter, dated Octo-

the university's Faculty–Staff Benefits Manual."

3. A similar story appeared the same day in *The Current,* a public television and radio trade publication.

ber 29, 2003, that cited the reasons for termination as being "an extremely serious management crisis with the staff, a public relations disaster with the Washington media, and three successive years of increasing and unacceptably large financial losses, which have substantially impaired station operations." The letter asserted that Clampitt was fired "for cause." Thereafter, according to one news report dated November 3, 2003, the University's Director of Media Relations told the press that "Clampitt was relieved of her duties ... after the *Washington Post* exposed a financial deficit and morale problems" at WAMU. The day after the termination, the *Post* quoted Ladner as saying that "his decision was based on several factors, including the continuing pattern of deficits...." [4]

On June 30, 2004, Clampitt filed her complaint against the University and against Ladner in his personal capacity. As her counsel told the court at a hearing on the University's motion for summary judgment, Clampitt expected to testify at trial that she "was told repeatedly in the weeks and months after her termination that she could not be hired anywhere else. She was radioactive. You Google her name and the first thing that pops up is Clampitt terminated by American University under cloud of financial improprieties and staff mismanagement."

In his deposition on December 16, 2004, Ladner testified that he reviewed a two-page summary of questions or issues prepared by defense counsel in preparation for the deposition. Clampitt then filed a motion to compel production of the two-page document. The trial court denied the motion at oral argument and in a subsequent written order. On October 12, 2006, the trial court granted the University's motion for summary judgment as to the defamation count against the University, having already granted appellees' motion to dismiss on the pleadings Clampitt's claims against Ladner in his personal capacity. By order dated January 9, 2007, the trial court granted summary judgment as to the remaining counts of the Amended Complaint. This appeal followed.

## II.

■■■ We review a trial court's rulings on discovery for an abuse of discretion. *Futrell v. Department of Labor Fed. Credit Union,* 816 A.2d 793, 809 (D.C.2003). We may reverse a trial court's ruling on discovery issues only if the ruling goes beyond the reasonable exercise of discretion. *White v. Washington Metropolitan Area Transit Authority,* 432 A.2d 726, 728–29 (D.C.1981).

■■ We review a trial court's grant of a motion for summary judgment *de novo.* *Kotsch v. District of Columbia,* 924 A.2d 1040, 1044 (D.C.2007) (citing *Woodland v. District Council 20,* 777 A.2d 795, 798 (D.C.2001)). Our standard of review is the same as the trial court's standard for initially considering a party's motion for summary judgment; that is, summary judgment is proper if there is no issue of material fact and the record shows that the moving party is entitled to judgment as a matter of law. Super. Ct. Civ. R. 56(c).

■■■ We review *de novo* a trial court's dismissal of claims on the pleadings pursuant to Super. Ct. Civ. R. 12(b)(6). *Chamberlain v. American Honda Fin. Corp.,* 931 A.2d 1018 (D.C.2007). Like the trial court, this court must "accept[ ] all of the allegations in the complaint as true, and must construe all facts and inferences in favor of the plaintiff." *Murray v. Wells*

---

**4.** Clampitt testified that there was "no deficit at the time I left" the station.

*Fargo Home Mortgage,* 953 A.2d 308, 316 (D.C.2008). Because "[o]ur rules reject the approach that pleading is a game of skill in which one misstep ... may be decisive to the outcome" and "manifest a preference for resolution of disputes on the merits, not on technicalities of pleading," we construe pleadings "as to do substantial justice." *Carter–Obayuwana v. Howard Univ.,* 764 A.2d 779, 787 (D.C.2001) (citing Super. Ct. Civ. R. 8(f); other citations and internal quotation marks omitted). "Dismissal for failure to state a claim on which relief can be granted is impermissible unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Murray,* 953 A.2d at 316 (citations and internal quotation marks omitted). At the same time, "[f]actual allegations must be enough to raise a right to relief above the speculative level...." *Bell Atl. Corp. v. Twombly,* —— U.S. ——, ——, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).

### III.

■ We begin with Clampitt's challenge to the court's discovery ruling, recognizing Clampitt's argument that if she prevails on this claim, at least conceivably she could discover additional information with which she could support one or more of her dismissed claims.

At his deposition, in response to a question about whether he had reviewed any materials to prepare for the deposition, Ladner testified that he had reviewed a "summary of questions or issues of about two pages that counsel prepared to discuss

with me." Thereafter, Clampitt moved to compel production of the document that Ladner described.[5] The University's counsel represented to the court that when he met with Ladner prior to the deposition, he (counsel) used the worksheet, a copy of which he left with Ladner, to "verify [counsel's] understanding of the facts of the case," facts "which were otherwise third-hand given to me before then." Clampitt's counsel argued that seeing how Ladner's counsel had framed the issues necessarily would have influenced how Ladner framed his answers. The trial court denied the motion to compel, reasoning that a document that a lawyer "prepared in order to interview his client" is protected by attorney-client privilege. The court also noted that Clampitt's counsel had not asked for the document at the time of Ladner's deposition, with the result that Clampitt would be able to use the document only on cross-examination, "as something in the nature of an impeaching document."

In arguing that the trial court's ruling was an abuse of discretion, Clampitt relies on Rule 612 of the Federal Rules of Evidence, which provides that "if a witness uses a writing to refresh memory for the purpose of testifying, either (1) while testifying, or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced...."[6] But, as the University argues, in his deposition questioning of Ladner, Clampitt's counsel did not elicit testimony that the two-page list of "questions

---

**5.** Clampitt argues that the interests of justice required production of the document because Ladner testified that he could not recall what Clampitt contends are "critical" details pertinent to the issues in the case. She argues that the document is "the very kind of docu-

ment that could shed light on [Ladner's] apparent disparity of recall...."

**6.** As Clampitt notes, this court has followed the requirements of Rule 612. *See Hawthorne v. United States,* 504 A.2d 580, 586 n. 15 (D.C.1986).

or issues" refreshed Ladner's recollection; indeed, counsel asked no follow-up questions about the two-page document.[7] Thus, Clampitt did not establish the first of the "three foundational elements [that] must be met before Rule 612 is applicable with respect to documents reviewed by a witness to prepare for a deposition," *i.e.*, that "a witness must use a writing to refresh his or her memory." *Nutramax,* 183 F.R.D. at 468; *see also Sporck v. Peil,* 759 F.2d 312, 318 (3d Cir.1985) (holding that "deposing counsel failed to lay a proper foundation under Rule 612 for production of the documents selected by counsel" in that he "failed to establish either that petitioner relied on any documents in giving his testimony, or that those documents influenced his testimony"); *Suss v. MSX Int'l Eng'g Servs., Inc.,* 212 F.R.D. 159, 165 (S.D.N.Y.2002) (" 'Relied upon' means more than simply reviewing.... Unless there is some demonstrated impact on the witnesses testimony, the witness cannot be deemed to have relied on the document"). Accordingly, we conclude that the trial court did not abuse its discretion by denying Clampitt's motion to compel.[8]

---

7. Nor can we say that Ladner answered counsel's question about the document "in an evasive and incomplete manner," from which the court might have drawn "an inference ... [that] such assistance was received." *Nutramax Laboratories, Inc. v. Twin Laboratories, Inc.,* 183 F.R.D. 458, 473 (D.Md.1998).

8. We note, however, that in describing the basis for its ruling as "attorney-client" privilege, the court misspoke. It is the attorney "work product doctrine [, which] is intended to protect 'pure expressions of legal theory or mental impressions,' " rather than attorney-client privilege, that is implicated here, given that "the very process of deciding ... the questions to be asked, ... offers insight into how the attorney taking or directing the taking of the statements views the case." *Nutramax* 183 F.R.D. at 465; *see also* S.Ct. Civ. R. 26(b)(3) (providing that, in ordering discovery

## IV.

■ In this jurisdiction, the general rule is that "an employment contract ... is terminable at the will of either party." *Smith v. Union Labor Life Ins. Co.,* 620 A.2d 265, 268 (D.C.1993). Clampitt contends that she had an oral contract or an implied contract of employment with the University that took her employment arrangement outside that general rule. More specifically, she contends in her brief that the University breached its oral agreement that she could remain in her position at WAMU until she chose to retire, which she expected would be at age 70. She argues in the alternative that the terms of the University's "Executive/Senior Staff Personnel Policies" Manual (the "Senior Staff Manual" or the "Manual") created an implied contract of employment under which she could be terminated only for legitimate cause.

## A.

The trial court held that Clampitt's oral contract claim was barred by the statute of frauds, under which no action may be brought "upon an agreement that is not to

---

of documents prepared in anticipation of litigation or for trial, "the Court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation"), a rule that "is identical to Fed.R.Civ.P. 26(b)(3)," *Parks v. United States,* 451 A.2d 591, 608 (D.C.1982), which "codifies the work product doctrine." *Nutramax,* 183 F.R.D. at 461. "Although the attorney client privilege and the work product rule have similarities, they are distinct doctrines, which protect different interests." *Id.* at 464 n. 10 (citing authority that "[t]he attorney client privilege is intended to promote communications between lawyer and client by protecting client confidences. The work product doctrine is broader, designed to promote the needs of the adversary system").

be performed within one year from the making thereof, unless the agreement upon which the action is brought, or a memorandum or note thereof, is in writing, ... signed by the party to be charged therewith or a person authorized by him." D.C.Code § 28–3502. Clampitt's claim, the court reasoned, was that the University made a promise of "at least eleven years of employment," a promise that the court found "cannot be performed within a year." The court noted that, in their depositions, Ladner and Myers disputed that any such promise was made. Ladner recalled talking with Clampitt about "her commitment if she took the job, her enthusiasm for the position, and her wanting to, you know, succeed in the position," but testified that he could not recall talking with Clampitt about the terms of her employment. Myers testified that he recalled no discussion in which Clampitt asked "that she be able to remain at WAMU until she retired or until she decided to retire" and also recalled no discussion about Clampitt "wanting or expecting to be able to work until age 70" or "until any age at all," [9] or about Clampitt wanting the WAMU job to be her last job before retirement. Myers further testified that he did not tell Clampitt "that she would be able to work until age 70." The court observed that the only writing in the record that "[came] close to the writing required" by the statute of frauds was the April 24, 2000 job offer letter signed by Ladner, see note 2, *supra*, which made no mention of the "durational expectations of either party and thus fails under the statute."

Arguing that the trial court's ruling was in error, Clampitt relies on our case law holding that if an agreement is "capable, possible, or susceptible of performance within one year, the statute of frauds does not apply and an oral agreement may suffice." *Launay v. Launay, Inc.*, 497 A.2d 443, 449 n. 4 (D.C.1985); *see also Rinck v. Association of Reserve City Bankers*, 676 A.2d 12, 16 n. 3 (D.C.1996) ("Since the employment agreement at issue was capable of being performed within a year, it is not deficient under the statute of frauds."). She contends that the oral contract she alleges was susceptible of performance within a year because she might have chosen to retire within a year of being hired, and thus much sooner than age 70.

Clampitt likens her case to the facts of *Hodge v. Evans Fin. Corp.*, 262 U.S.App. D.C. 151, 823 F.2d 559, 561 (1987). The facts of that case were that plaintiff Hodge met with Tilley, the president of Evans Financial Corporation, to discuss Hodge's possible employment by Evans. Tilley asked Hodge what his conditions were for accepting a job with Evans, and Hodge replied, "No. 1, the job must be permanent. Because of my age, I have a great fear about going back into the marketplace again. I want to be here until I retire." 823 F.2d at 561. Hodge testified that Tilley's response was "I accept that condition." *Id.* Hodge accepted Evans's offer of employment as vice president and worked for Evans from September 1980 until he was fired by Tilley on May 7, 1981. *Id.* The United States Court of Appeals for the District of Columbia Circuit, applying the District of Columbia statute of frauds, agreed with Hodge's argument that his contract was "a permanent or lifetime employment contract" that could be enforced despite the statute of frauds "because it is capable of full performance within one year if the employee were to die within the

9. Myers testified, "it's ... not something that would have been standard, so I think I would have remembered if it came up."

period." *Id.* at 562. The court reasoned that "Hodge's view of the statute's applicability to lifetime or permanent employment contracts has, in fact, been accepted by an overwhelming majority of courts and commentators." [10] *Id.; see also id.* at 563 ("employment contracts of an uncertain or permanent duration are excluded from the statute"); *Coan v. Orsinger,* 105 U.S.App. D.C. 201, 265 F.2d 575, 578 (1959) ("If the contingency which fulfills and completes the terms of the contract happens or could possibly happen within a year, the contract is not within the statute."). The *Hodge* court distinguished *Prouty v. National R.R. Passenger Corp.,* 572 F.Supp. 200 (D.D.C.1983) (involving an allegation that plaintiff "was promised employment with Amtrak until he was eligible for retirement at the age of sixty-five," *id.* at 204), and *Gebhard v. GAF Corp.,* 59 F.R.D. 504 (D.D.C.1973) (involving an allegation that

defendant guaranteed plaintiffs "employment until age 65," *id.* at 506), as cases not involving alleged contracts providing for indefinite, lifetime or permanent employment, but instead cases in which plaintiffs alleged that the oral contracts at issue guaranteed them employment "for a specified period of time." *Hodge,* 262 U.S.App. D.C. at 155, 823 F.2d at 563. The court reasoned that "an oral employment contract for a stated, definite term of years exceeding one year (like those alleged in *Prouty* and *Gebhard*) is unenforceable on the rationale that the employee's possible death within one year would 'defeat' rather than 'complete' the express terms of the contract." *Id.*[11]

██ We conclude that, on the basis of Clampitt's own words, her case is more like *Gebhard* and *Prouty* than like *Hodge.*[12] In describing the process of in-

10. The court noted that the "settled legal principle[ ]" that contracts of "indefinite permanent employment" are not barred by the statute of frauds is a "narrowing interpretation overwhelmingly adopted by courts and commentators ... designed to mollify the often harsh and unintended consequences of the statute." 823 F.2d at 565; *but see McInerney v. Charter Golf, Inc.,* 176 Ill.2d 482, 223 Ill.Dec. 911, 680 N.E.2d 1347, 1351–52 (1997) ("We find such an interpretation hollow and unpersuasive. A 'lifetime' employment contract ... [i]nherently ... anticipates a relationship of long duration—certainly longer than one year.... [W]e believe that the better view is to treat the contract as one 'not to be performed within the space of one year from the making thereof.' To hold otherwise would eviscerate the policy underlying the statute of frauds and would invite confusion, uncertainty and outright fraud. Accordingly, we hold that a writing is required for the fair enforcement of lifetime employment contracts").

11. The *Hodge* court further reasoned:
The fact that Hodge expected to retire at some point does not mean that his contract could not possibly be performed within one year.... Hodge's permanent employment

contract with Evans could therefore be fully performed, according to its terms, upon Hodge's retirement or upon his death.... That Hodge expected to retire before he died is completely irrelevant to this case so long as the contract was legally susceptible of performance within one year. The applicability of the statute of frauds does not depend on the expectations of the parties. *Hodge,* 262 U.S.App. D.C. at 156, 823 F.2d at 564.

12. We hasten to acknowledge, as the *Hodge* court did, that the conventional application of the statute of frauds is "somewhat 'legalistic,' " and that the statute may function "as a formal legal device that shields promise breakers from the consequences of otherwise enforceable agreements." *Hodge,* 262 U.S.App. D.C. at 157, 823 F.2d at 565; *see also Ohanian v. Avis Rent A Car System, Inc.,* 779 F.2d 101, 106 (2d Cir.1985) ("Whatever may be the fact with regard to the history of the statute, and whatever may have been the difficulties arising from proof that all sides agree brought about the enactment of the statute of frauds over 300 years ago, it is an anachronism today. The reasons that prompted its passage no longer exist. And, far from serving as a barrier to fraud—in the

terviews that led to her hiring, Clampitt testified that the interviewers "wanted to make sure that I was not just there for a year or two and then on to something else. They—they made it very clear that they were looking for somebody there for the long haul." When Clampitt met with Ladner, she testified, he asked whether she was "prepared to make a commitment in terms of time" and "seemed pleased" when Clampitt stated that she "saw it as the last job [she] would ever have." After Ladner offered Clampitt the job at a salary that she told him was not adequate, she met with Myers to negotiate and asked him for a written contract, which he said would be against University policy. In the following exchange at her deposition, Clampitt gave her account of what next transpired:

Q. . . . And you said what?

A. I said that I needed more than a handshake.

Q. And he [Myers] said?

A. And I said to him that I needed the assurance that I could be there until I retired.

Q. And he said?

A. And he said, Well, of course, you can be here until you're retired.

Q. And what was the next discussion?

A. And I said I was not planning to retire anytime soon.

Q. And he said?

A. And I said—And I said that I couldn't imagine retiring before I was 70. And he said, You can retire—Then you can retire when you're—you know, in your 70's.

Q. He said, Then you can retire when you're 70?

A. Yes. And there may have been some discussion about mandatory retirement at age 70.

When Clampitt called Myers after that meeting to say that she would accept the job, she "told Myers that [she] was very uncomfortable about not receiving a written contract. And, again, he assured me." The following questions and answers ensued:

A. I said, Tom, I'm counting on you for this. . . . I'm counting on you . . . and President Ladner that your word is—is good.

Q. As to what?

A. As to the retirement and duration of my job.

Q. That's what you said to him?

A. Uh-huh.

Q. And he said?

A. And he said yes.

Elsewhere in her deposition, Clampitt said, "I was promised I would be there until I was 70 years old. . . ." In response to questioning by her own counsel, Clampitt clarified:

Q. During the face-to-face meeting with Tom Myers in his office to negotiate—the one meeting as opposed to the phone conversation that you testified about—to negotiate your terms—I believe what you said was—and correct me if I'm wrong—in response to your statement to Tom Myers that you wanted to—would be able to retire from the job at 70—what he said was, "Of course you can retire at 70," is that accurate?

---

case of a genuinely aggrieved plaintiff barred from enforcing an oral contract—the statute may actually shield fraud"). *But see McInerney,* 223 Ill.Dec. 911, 680 N.E.2d at 1351 (reasoning that "the statute exists to protect not just the parties to a contract, but also—perhaps more importantly—to protect the fact finder from charlatans, perjurers and the problems of proof accompanying oral contracts").

A. What I meant to say was I could retire from that job when I was 70.

Q. Well, what, if anything, did Mr. Myers say about you retiring at 70 vis-a-vis the duration of your job.

A. I could retire from that job when I was 70.

Q. Okay. Did he say anything else about that vis-a-vis the duration of the job?

A. He said that I could be in that job until I was 70, in my seventies—you know, I was 70. He didn't say whether it was the first day I was 70 or the last day I was 70.

Q. Well that was my next question, if you had any conversation with him about any particular time that you reached 70 years of age that you had anticipated retiring. Was it the day you turned 70?

A. No, we did not discuss whether it was the day I turned 70 or—we just used the word "seventy."

Q. Was there any particular—

A. And I used—And I used that because that was when I could—I would be able to take full Social Security retirement benefits.

Q. During that series of questions that Mr. Semler asked you about this, you made some reference to some discussion you might have had with Mr. Myers about mandatory retirement. Can you elaborate on that? Are you aware of anything on university documents about that?

A. I wasn't at the time, but he said that there was a mandatory retirement at 70.

Q. By that wasn't-Okay. I'm sorry. He said that during this—

A. Yes.

Q. —face-to-face meeting?

A. Mm-hmm.

Q. Did he say anything about whether that meant, on the day you turned 70 you were expected to retire or how that was put into effect?

A. He said I could be in that job until I chose to retire from that job.

Q. Right, but how did the "70" come in, the reference to "70"?

A. I mentioned 70 because it was—you know, I probably said at least 70 because what I was thinking was Social Security.

Q. Okay. You then said you had a telephone conversation with him in which you described that he again reassured you. Can you relate that conversation? I think all you said was, again, he reassured me. He said yes. It wasn't really clear what he was saying yes to you, and I want you to—

A. I said again that I wanted a written—I wanted something in writing. I said that I could not—you know, I was not comfortable without having it in writing. And I asked him again if he could assure me that I could stay in that job until I chose to retire.

Q. And what did he say, if anything, in response?

A. He said, "Of course."

Thus, in her deposition, Clampitt repeatedly characterized the oral contract with the University not only as a promise that she *could* hold the job at WAMU until age 70, but also as a promise and mutual expectation that she *would* do so. In her Amended Complaint, she alleged that she "had a binding contract of employment with [the University] for the specific term ending in the year she turned 70 and on the date she chose to retire." Similarly, in her Statement of Material Facts in Dispute in Support of Opposition to Defen-

dant's Motion for Summary Judgment, Clampitt summarized her contention as, "Plaintiff agreed to stay at the position for a substantial period of time, at least until the age of 70 when she would be eligible for full social security benefits."

Clampitt's statements make *apropos* the holding of *Gebhard,* that "an oral contract obviously contemplating long-term employment is void under the Statute of Frauds." *Gebhard,* 59 F.R.D. at 506. Consistent with her characterization of the alleged oral agreement, it seems correct to say that any decision she might have made to retire early, within a year of being hired, would have defeated rather than completed the terms of the oral contract—meaning, as the trial court ultimately concluded, that the oral contract Clampitt seeks to prove could not have been completed within one year.[13] Such oral agreement not having been memorialized in a writing signed by the University, and the University not having admitted facts demonstrating that there was an oral agreement for long-term employment,[14] Clampitt's suit to enforce the oral agreement she alleges was barred by the statute of frauds, and the trial court did not err in so holding.[15]

**B.**

 We next consider Clampitt's claim that the trial court erred in dismissing on summary judgment her claim that the University breached an implied contract of employment. Our case law recognizes that "under certain circumstances, the provisions of an employment handbook may constitute an implicit contractual limitation upon an employer's otherwise unfettered right to terminate its employees." *Howard Univ. v. Lacy,* 828 A.2d 733, 739 n. 7 (D.C.2003); *see also Washington Welfare Ass'n v. Wheeler,* 496 A.2d 613, 615–16 (D.C.1985) (stating that an "employer's personnel manual is evidence of the terms and conditions both employer and employee accept as part of the agreement," and concluding that where an employee "Manual evidences intent of the parties that specific preconditions had to be met before employment could be terminated," the employment contract is "distinguishable from a pure 'at will' contract"); *Rinck,* 676 A.2d

---

13. This is not a case in which "the contract extends to a point in time, ... at which time the full service contemplated will have been rendered, and that point in time could occur within one year," *Martin v. Federal Life Ins. Co.,* 109 Ill.App.3d 596, 65 Ill.Dec. 143, 440 N.E.2d 998, 1005 (1982); or where "[t]here is nothing to indicate that plaintiff could not have completed his required performance [obtaining a Ph.D.] within a year, ... thereby rendering the agreement fully performed," *Kiyose v. Trustees of Indiana Univ.,* 166 Ind. App. 34, 333 N.E.2d 886, 890 (1975); or where the "fulfillment, not annulment" of the alleged contract could "be fully performed on one side within a year." *Silverman v. Bernot,* 218 Va. 650, 239 S.E.2d 118, 121 (1977). Here, the full service that Clampitt says was contemplated could not have occurred within a year; the alleged oral contract was "terminable within a year only upon its breach," and thus, we conclude, "proof of same is barred by the statute." *Ohanian,* 779 F.2d at 107.

14. *See Hackney v. Morelite Constr.,* 418 A.2d 1062, 1067 (D.C.1980) ("we hold that the appellee in this case is barred from asserting the statute of frauds as a defense if the facts its counsel stipulated to on its behalf at trial show that it in fact orally agreed to the contract sought to be enforced against it").

15. *See Paul v. Howard Univ.,* 754 A.2d 297, 311 (D.C.2000) (holding, in case where "[t]he only basis in the record for an enforceable implied contract is Dr. Paul's unsupported statement in her own affidavit that appellees Momoh and Walker 'assured' her that she would receive tenure when she signed the contract for a lecturer position," that "[s]uch alleged 'assurance'" was "plainly insufficient to establish the elements of a binding contract, either express or implied").

at 16 ("a personnel manual that states specific preconditions that must be met before employment will be terminated is sufficiently clear to rebut the presumption of at-will employment"); *Strass v. Kaiser Found. Health Plan,* 744 A.2d 1000, 1013–14 (D.C.2000) (same). Where an employee manual "provide[s] for termination only under ... conditions" set forth therein and states that all staff members are to be given a copy and are to acknowledge receipt in writing, "[s]uch factors provide evidence from which it may be reasonably inferred that the parties intended the manual to establish contractual rights between them." *Nickens v. Labor Agency of Metro. Washington,* 600 A.2d 813, 817 (D.C. 1991); *see also Sisco v. GSA Nat'l Capital Fed. Credit Union,* 689 A.2d 52, 54–55 (D.C.1997). In such circumstances, an enforceable contract may be found even if the employee did not peruse the manual when it was received. *See Nickens,* 600 A.2d at 817 n. 2 (reasoning that an employer "cannot avoid obligations under the policies because the employee failed to read them").

The Senior Staff Manual—which Clampitt contends overcame the presumption of at-will employment—provides, at section 2.1, that "appointments of ... Senior Staff are presumed to be continuous, subject to the provisions for termination...." Section 2.6 of the Manual sets out the provisions governing terminations, "stating that Senior Staff may be terminated only (a) for cause; [16] (b) when the responsible University officer determines such action is in the best interest of the University; or (c) when the position is eliminated because of reorganization." Clampitt contends that,

contrary to the statement in her termination letter that she was being fired "for cause," the University did not have "cause" to terminate her, and that it breached the implied contract created by the Senior Staff Manual when it fired her.

The trial court dismissed Clampitt's implied contract claim on the basis of Clampitt's testimony at her deposition that she had never before seen the Senior Staff Manual and her answer, when asked whether anyone had ever given her a copy of the Manual, of "No, I received something different." Clampitt contends that a genuine question of fact nevertheless exists as to whether the policies described in the Senior Staff Manual established a contract (i) because the University produced the Senior Staff Manual during discovery in response to Clampitt's request for "[a]ll personnel policy handbooks applicable to the employment of Plaintiff"; (ii) because the Manual states that "Executive or senior staff members are furnished copies of this manual"; and (iii) because she testified at her deposition that "somebody from HR came and gave me a whole bunch of documents" at the time of her orientation, permitting an inference that the Senior Staff Manual was among the documents she was given.

However, as the trial court noted, Beth Muha, the University's Executive Director of Human Resources since 1998, testified in her deposition that the Manual, dated 1984, "needed to be revised, and at some point prior to my employment a decision was made to stop distributing it." Muha testified that the Manual "was not being distributed to senior staff" after she came

**16.** The Manual states that there is "cause" "when any of the following conditions prevail: the inability, failure, or refusal of the staff member to maintain satisfactory performance of the responsibilities of the position; conduct which directly and substantially impairs the effectiveness of the staff member in the performance of his or her responsibilities; conduct which directly and substantially impairs or is detrimental to the University or University operations."

in, that to her knowledge it was not distributed to Clampitt, and that Clampitt never discussed it with her. Similarly, Grace Karmiol, the University's Director of Human Resources Policies and Regulatory Affairs since 1999, testified that the Manual had been under revision for as long as she had been at the University and was "not disseminated." Karmiol testified that her office used the Manual as "guidance only" and as "guidelines internally for human resources," but that the Manual was "not distributed internally" and, during her tenure, was not "usually" or "uniformly" distributed to senior staff members such as Clampitt. Karmiol was "not aware of a copy being given to Ms. Clampitt" and testified that the Manual was not posted on the University intranet during the period of Clampitt's employment.

Clampitt argues that the foregoing record evidence "creates significant disputed issues of fact" that precluded summary judgment. We disagree. To avoid summary judgment, Clampitt was required to "set forth specific facts showing that there is a genuine issue for trial," Super. Ct. Civ. R. 56(e), and "some significant probative evidence tending to support [her] complaint." *Warren v. Medlantic Health Group, Inc.*, 936 A.2d 733, 737 (D.C.2007). "[A]ll justifiable inferences [were] to be drawn in [Clampitt's] favor," *Allen v. Yates,* 870 A.2d 39, 44 (D.C.2005), but for her to avoid summary judgment, the inferences she asked the court to draw had to be "based on more than speculation." *Rogers Corp. v. EPA,* 348 U.S.App. D.C. 352, 275 F.3d 1096, 1103 (2002). She was not entitled to avoid summary judgment "by merely asserting that the jury might, and legally could, disbelieve" the defendants. *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505; *see also Gould v. Kemper Nat'l Ins. Cos.,* 1996 WL 87498, *2, 1996 U.S.App. LEXIS 4844, *5 (7th Cir.1996) ("the mere possibility of disbelief is not

enough to avoid summary judgment. There must instead be evidence from which a rational factfinder could infer that the [defendants] lied") (citation and internal quotation marks omitted).

■ Thus, to get to the jury on a claim that the University was contractually bound by the policies in the Senior Staff Manual, Clampitt was required to set forth "significant, probative evidence," *Warren,* 936 A.2d at 737, that the Manual was given to her or that it was published or distributed to all employees. *See Sisco,* 689 A.2d at 55 (noting that the teaching of this court's decisions is that "assurances by an employer in a personnel or policy manual *distributed to all employees* that are clear enough in limiting the right to terminate to specific causes or events will overcome the presumption of at-will employment" (italics added) (quoting *Rinck,* 676 A.2d at 16–17), and stating that "[w]e look to both the terms of the manual and the manner of its distribution to determine whether a jury issue is presented"); *see also id.* at 57 (noting that an "employer's intent to be bound" by discipline and discharge policy can be inferred where the policy is "expressed in a written manual given to all employees" and holding that "remaining with an employer *after receipt* of a personnel manual promising job security supplies the necessary consideration to make the promise legally enforceable") (italics added). Clampitt could not rest on the possibility that the jury might disbelieve the explanations of the University's Human Resources officers that the Manual had not been distributed for years, was obsolete and under revision, was used only for guidance, and to their knowledge had not been distributed to Clampitt. Nor could Clampitt rely on the mere possibility that the Manual was among the "whole bunch of documents" she received when she came on board. Because Clampitt had no affir-

mative evidence that she received, relied on or bargained for policies set forth in the Senior Staff Manual when she began or continued her employment, the trial court did not err in ruling that the University was entitled to summary judgment on Clampitt's implied contract claim.[17] *See Howard Univ.*, 828 A.2d at 739 n. 7 (for a contract to be implied, "an employee must demonstrate that the employer made a promise concerning the time or manner in which the employment could be terminated and that the promise is enforceable because the employee gave consideration or otherwise reasonably relied upon the promise to his detriment").

## V.

Because we conclude, as discussed *supra*, that the University was entitled to summary judgment on Clampitt's claims that she had an oral or implied contract of employment, we also conclude that the trial court properly dismissed Clampitt's claims for tortious interference with contract and for breach of the duty of good faith and fair dealing. *See Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 289 (D.C.1989) (noting that the first element of the tort of intentional interference with contractual relations is the existence of a contract);[18]

---

17. As noted *supra*, Clampitt points to the University's having produced the Senior Staff Manual in response to her discovery request for "[a]ll personnel policy handbooks applicable to the employment of Plaintiff" as conclusive evidence that the Senior Staff Manual governed the terms of her employment. She argues in addition that the jury could infer that the Manual governed her employment because the reason listed for her termination in the termination letter ("for cause") conforms to the language of the Manual. However, both of these facts are consistent with the University's explanation that its Human Resources Department used the Senior Staff Manual for "guidance." And, where there is no evidence that a personnel policies manual is distributed to employees or regularly made available to them, *see Sisco*, 689 A.2d at 55, the fact that an employer follows the policies when taking personnel actions does not suffice to show that the policies are terms of an implied contract. *See Koch v. Illinois Power Co.*, 175 Ill.App.3d 248, 124 Ill.Dec. 461, 529 N.E.2d 281, 287 (1988) ("Handbooks that amount to no more than guidelines for supervisors in their termination decisions do not contractually bind the employer if an employee could not reasonably believe that the guidelines constitute an offer"); *Watson v. National R.R. Passenger Corp.*, 1989 WL 44140, *2, 1989 U.S. Dist. LEXIS 4631, *5–6 (N.D.Ill.1989) (finding no contract arising from guidelines that the receiving employee knew were distributed only to limited personnel, even if a supervisor placed a copy of the guidelines in a manual to which all employees had access); *Anderson v. Hewlett–Packard*

*Corp.*, 694 F.Supp. 1294, 1296 (N.D.Ohio 1988) (concluding that Hewlett–Packard personnel and policy guidelines did not constitute an employment contract, where the guidelines were given to the plaintiff employee only in his capacity as a personnel supervisor, and where they were not distributed to all employees or even to all managers).

Moreover, the termination letter's reference to "for cause" is consistent not just with the Senior Staff Manual's provision stating that a senior staff member terminated "for cause" "will be provided with a statement of reasons," but also with the statement in the University's "Staff Personnel Policies Manual" that a "statement of reasons for the action [*i.e.*, removal for cause] must accompany the Notice of Separation." The Staff Personnel Policies Manual, which Karmiol testified *was* in effect during Clampitt's tenure, disclaims contract status, saying "[t]hese policies are not intended to constitute a contract of employment.... Employment may be terminated at any time and for any reason by either the employee or the university."

Clampitt's argument that a jury could infer that the Manual was distributed because it says it was distributed to senior staff is likewise unpersuasive. Accepting that argument would require us to conclude that any document with such language remains in effect even if all interested parties agree that the document has been superseded.

18. Moreover, as we re-affirmed in *Paul v. Howard Univ.*, 754 A.2d at 309, while a plaintiff may "recover for interference with con-

*Hais v. Smith,* 547 A.2d 986, 987 (D.C. 1988) ("in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing") (citation and internal quotation marks omitted); *Kerrigan v. Britches of Georgetowne,* 705 A.2d 624, 627 (D.C.1997) (holding that "as an employee at will, not under contract," plaintiff had "no basis for claiming breach of a 'covenant' ").

## VI.

█ The premise for Clampitt's defamation count is her claim that the University effected a "public termination of Clampitt's employment at a time when stories in the press suggested that she was mismanaging finances and her staff at WAMU." Clampitt asserts that the University, through Ladner, took this action even though Ladner had specifically approved Clampitt's financial and budgetary recommendations and thus knew or should have known that the allegations or implied accusations of financial mismanagement were false and without foundation. We understand Clampitt's claim about a "public" termination to relate to statements that the University and Ladner made to the press in the immediate wake of Clampitt's firing, announcing, and explaining the termination decision.[19] The trial court dismissed Clampitt's defamation claim because there was not sufficient evidence to support it. We disagree.

█ Whether a communication is capable of defamatory meaning is a question of law. *Clawson v. St. Louis Post–Dispatch,* 906 A.2d 308, 313 (D.C.2006). As Clampitt correctly notes, this court has held that "actionable defamation is not necessarily restricted to verbal conduct." *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 878 n. 5 (D.C.1998) (holding that defendant law firm's "alleged non-verbal representation (by inactivating the plaintiff's access key and thus effectively locking her out of the office) that she had done something disgraceful" could not "fairly be characterized as non-defamatory as a matter of law") (citing, *inter alia,* PROSSER AND KEATON ON THE LAW OF TORTS, § 112, at 786 (5th ed.1984), and Gregory G. Sarno, Annotation, *Libel or Slander: Defamation by Gestures or Acts,* 46 A.L.R.4th 403 (1986)).[20] In other words, we have rec-

---

tractual relations by a supervisor who is not an officer [upon] ... evidence that the supervisor acted with malice," the "officers of a University act as the University's agents and thus cannot be held liable for tortiously interfering with a contract between the University and a third party."

19. In explaining the claim during the hearing on appellees' Motion for Partial Judgment on the Pleadings, Clampitt's counsel told the court that appellees "ratified the stories" printed in the *Washington Post,* and that "in the subsequent stories, Dr. Ladner is quoted as attributing the termination to those very things that were circulating in the stories."

20. *Wallace* involved a claim that plaintiff was "locked out of the firm's offices by the inacti-

vation of her access key," an action by which the defendant firm "maliciously published a false and defamatory communication to the effect that [plaintiff] had performed some unspecified disgraceful, immoral and/or dishonest act." *Wallace* at 877. For purposes of ruling on whether Wallace's defamation claim could survive a motion to dismiss for failure to state a claim, we "accept[ed] as true the allegation that this treatment was ordinarily meted out only to attorneys who had engaged in criminal or unethical activity." *Id.* at 878 n. 5. We were satisfied that the defendants' "alleged non-verbal representation" was capable of defamatory meaning and therefore held that the trial court had erred in dismissing the defamation claim.

ognized that, at least in some contexts, defamatory statements may consist of or entail actions or conduct rather than mere words

We also have little trouble concluding that the article that appeared in the *Washington Post* on October 20, 2003—asserting that under Clampitt's watch, WAMU had been "awash" with "large operating deficits," and describing a depletion of the station's emergency cash fund by millions of dollars—is capable of defamatory meaning. On this, we agree with Ladner, who acknowledged at his deposition that "anytime you get high profile articles about financial difficulties," suspicion that those involved "had engaged in criminal activity or had done something [entailing] financial impropriety" "is a natural question." *Cf. Moss v. Stockard,* 580 A.2d 1011, 1023 (D.C.1990) (applying the rule that a statement must be taken in the sense in which it would be understood by those to whom it was addressed, and concluding that statement that plaintiff had misappropriated funds could be understood to mean that plaintiff had engaged in some form of deliberate wrongdoing); *Gadach v. Benton*

*County Co-op. Ass'n,* 236 Minn. 507, 53 N.W.2d 230, 233 (1952) (holding that "the term 'deficit' may under certain circumstances convey a defamatory meaning").

Nevertheless, if Clampitt's claim were only that the University terminated her in the immediate wake of the *Washington Post* or other press reports, we would be unwilling to extend our reasoning in *Wallace* to allow Clampitt's claim. Terminations of at-will employees can occur "for any reason, or for no reason at all," *see Fingerhut v. Children's Nat'l Med. Ctr.,* 738 A.2d 799, 803 n. 6 (D.C. 1999) (citation and internal quotation marks omitted), including reasons that have arisen before or after a negative press report and that are unrelated to such report. Thus, any message conveyed by a termination standing alone is ambiguous.[21] We are not prepared to hold that a cause of action for defamation arises merely upon the interpretation that third parties have placed upon a termination, or upon an employer's public silence in the wake of terminating an employee who has been the subject of negative press reports.[22] Such a holding would, we think,

---

We note that the trial court ultimately entered summary judgment for defendants on Wallace's defamation claim. *See* 799 A.2d 381, 383 n. 1. (D.C.2002)

21. Note that in *Wallace,* we were cautionary about the possible ambiguity of non-verbal representations. We concluded that the "non-verbal representation" that Wallace described stated a claim for defamation because it allegedly conveyed only one message, in that the law firm had "previously terminated attorneys in a similar manner only when such attorneys had been caught stealing, engaging in insider training, or engaging in child molestation." 715 A.2d at 877. We observed that "[i]f the record were to show that the access keys of all departing employees are routinely inactivated, then the court would be confronted with an entirely different case." *Id.* at 878 n. 5.

22. *Cf. Gowin v. Hazen Mem'l Hosp. Ass'n,* 349 N.W.2d 4, 10 (N.D.1984) (holding, in case where plaintiff claimed that defendant slandered her professional reputation by arbitrarily and wrongfully demoting the plaintiff, thereby imputing to her a general disqualification to be a head of a laboratory department, that any inference which may have been drawn by third parties as a result of the demotion "does not make the demotion itself slanderous"); *Hoon v. Pate Constr. Co.,* 607 So.2d 423, 428–29 (Fla.Dist.Ct.App.1992) (holding, in case where plaintiff contractor alleged that defamation took place "by innuendo" when defendant announced publicly that the contract had been awarded to another contractor despite plaintiff's lowest bid and thereby made an implied announcement that plaintiff was incapable of performing, that "we have been cited no authority for the proposition that the 'non-verbal' act of rejecting the lowest dollar bid on a construction

be contrary to our doctrine of at-will employment.

Here, however, the record discloses a sufficient basis to allow Clampitt's claim about a defamatory "public" termination. As recounted *supra*, within days after Clampitt was fired, one news article reported that the University's Director of Media Relations told the press that "Clampitt was relieved of her duties ... after the *Washington Post* exposed a financial deficit and morale problems" at WAMU. The day after Clampitt's termination, the *Washington Post* quoted Ladner as saying that "his decision was based on several factors, including the continuing pattern of deficits...."[23] We are satisfied that these allegations raise a jury question about whether the University and Ladner defamed Clampitt by publicly appearing to adopt the allegations of financial mismanagement in the October 20, 2003 *Washington Post* article (and in other pre-termination press reports). This holding, we think, recognizes "society's interest in affording relief for reputational injury that results from defamatory falsehood," *Moss*, 580 A.2d at 1033 n. 37, without undermining employers' freedom to terminate at-will employees.

Although this case arises in a private rather than public employment context, it bears strong similarity to cases that have arisen in the public context, in which terminated employees have been permitted to go forward on claims that they were stigmatized (and thus deprived of a liberty interest) when their employers impliedly adopted statements made in allegedly defamatory derogatory press reports when terminating them in the wake of those reports. *See, e.g., Warren v. City of Junction City*, 176 F.Supp.2d 1118, 1123 (D.Kan.2001), *motion for judgment as a matter of law notwithstanding the verdict denied*, 207 F.Supp.2d 1216, 1218 (D.Kan. 2002). Warren was a former Police Chief who was terminated after a report questioning a police department investigation was sent to City officials and to the press, and after the press published a story summarizing the report's allegations that Warren had, *inter alia*, mismanaged the department and obstructed justice. 176 F.Supp.2d at 1123. After firing Warren, the City Manager sent a press release to local newspapers, and a newspaper article thereafter quoted the City Manager as saying, "It's action that we took ... as a result of things that have occurred at the police department." *Id.* at 1122–23. The court summarized Warren's claim as follows:

> Plaintiff does not rely on a published statement made directly by the city impugning his good name. Instead, he relies on an adoption theory. He asserts that a reasonable jury could find that the city adopted stigmatizing allegations contained in a newspaper article summarizing the ... report. The defendant urges the court to reject the adoption theory because the allegations in the newspaper did not come from the

---

project, or any similar non-verbal act, constitutes legally actionable defamation").

**23.** Clampitt also points to the fact that six weeks after her termination, the University placed an ad in the *Washington Post*, written by Ladner, stating that "no financial improprieties have been uncovered"—showing, she argues, that the University understood that it needed to dispel suggestions that Clampitt was responsible for misspending funds and

for financial improprieties, and raising a strong inference that the University understood that it had communicated precisely that when it "publicly" fired her. Clampitt emphasizes that even when the post-termination ad appeared, it said only that no financial improprieties were "uncovered," a weak disclaimer that (she argues) did not correct the impression left by the previous articles.

city, and the city never explicitly adopted them. The court agrees with the plaintiff and holds that a genuine issue of material fact exists regarding whether the defendant adopted stigmatizing statements in the course of the plaintiff's termination. *Id.* at 1131. The court went on to deny defendant's summary judgment motion as to plaintiff's deprivation-of-liberty-interest claim because, "particularly in light of the city manager's statement," *id.* at 1132, there was "a genuine issue of material fact whether the city, in the course of its termination proceedings, adopted allegations published in a local newspaper that stigmatized the plaintiff, and which the plaintiff alleges are false." *Id.* at 1121.

In holding that Clampitt's "public termination"—the University's public announcement and explanatory comments that followed Clampitt's firing in the wake of the October 20 *Washington Post* article—was capable of defamatory meaning, and that Clampitt's defamation claims against the University and Ladner may go forward, we of course reach no conclusion about whether the public termination actually was defamatory. Our holding reflects our conclusion that appellees' actions "cannot fairly be characterized as non-defamatory as a matter of law." *Wallace,* 715 A.2d at 878. A jury must determine whether the statements in the press, or what the statements implied, "injure[d] the plaintiff in [her] trade, profession or community standing, or lower[ed][her] in the estimation of the community," *Moss,* 580 A.2d at 1023; whether appellees adopted any statements that were so injurious, *see Warren v. City of Junction City,* 176 F.Supp.2d at 1132; and whether the statements or what they implied was true. *See Moss,* 580 A.2d at 1022 (noting that "truth is an absolute defense in defamation law"). This opinion does not foreclose any defense to the claims of defamation that appellees may have, or any affirmative defense or claim of mitigation that appellees may raise.[24]

■ Nor do we in this opinion decide the issue, which appellees raise, of whether Clampitt is a "limited-purpose public figure," *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974),[25] such that to prove defamation, she must "prove by clear and convincing evidence" that appellees acted "with actual malice, *i.e.,* intentional or reckless disregard for [the] falsity" of what their actions conveyed. *Moss,* 580 A.2d at 1029 (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). We acknowledge that whether Clampitt is a limited-purpose public figure "subject to the *New York Times* standard is a question of law to be resolved by the court," *id.,* a question which this court could address in the first instance. *See Connelly v. Swick & Shapiro,* 749 A.2d 1264, 1269 (D.C.2000). But because this is

---

24. We note that Ladner's column published in the *Washington Post* on December 12, 2003—which stated that its intent was a "clarification of misleading claims"—mentioned the need for "more disciplined spending decisions," but also explained that unrealistic revenue projections and "widespread staff dissatisfaction" were behind his decision to make a change in leadership. Clampitt does not deny that morale at the station was low, but testified that it was already "terrible" when she arrived at the station.

25. "[L]limited-purpose public figures" are individuals who are not deemed public figures for all purposes, but "who assume roles 'in the forefront of particular public controversies in order to influence the resolution of the issues involved,' and who are deemed public figures only for purposes of the controversy in which they are influential." *Moss,* 580 A.2d at 1030, quoting *Gertz,* 418 U.S. at 345, 94 S.Ct. 2997.

a case in which the trial court dismissed the defamation claim without findings of record and thus where "there are so few findings of fact pertaining to [the factors that bear on Clampitt's status]," we think it better to "defer here to the trial court to address the matter in the first instance." *Concord Enters., Inc. v. Binder,* 710 A.2d 219, 223 n. 6 (D.C.1998); *see also Connelly,* 749 A.2d at 1269 ("bearing in mind the way this case has evolved, prudence suggests that the trial judge consider it first").

■ A few additional points are necessary to explain why we reinstate Clampitt's defamation claim against Ladner. The trial court dismissed the claim on the pleadings on the ground that "there is nothing to suggest a motive for self-interest that would take the matter outside of his actions, on behalf of the university." Appellees urge us to affirm the court's ruling because Clampitt "fails to allege any facts of personal agenda or malicious intent of the President against Ms. Clampitt" and because she "points to no defamatory statement about her by President Ladner nor malicious excess of his qualified privilege of comment about employees." "In reviewing an order dismissing [on the pleadings] a claim for defamation, we continue to adhere to the standard of whether, construing the complaint in the light most favorable to the plaintiff, it appears beyond doubt that [plaintiff] can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Oparaugo v. Watts,* 884 A.2d 63, 77 (D.C. 2005). We have not adopted a "heightened pleading rule for defamation cases." *Id.* at 76–77. In light of our standard of review, we are satisfied that the allegations of the Complaint—though lacking in the detail supplied by the full summary judgment record—were sufficient to state a claim for defamation against Ladner personally. For example, in paragraph 47 of her Com-

plaint, Clampitt alleged that Ladner "publicly" terminated her and "defamed Plaintiff by creating the circumstances that would lead a reasonable person to conclude that Plaintiff was responsible for ... financial mismanagement" as reported in the press, "which ... Ladner knew or had reason to know was not true."

■ While, as appellees assert, our case law recognizes a qualified privilege of employers to comment about employees, *see Thomas v. Howard,* 168 A.2d 908, 909–10 (D.C.1961), that privilege can be lost where there is "excessive publication or express malice." *Id.* at 910. "Malice, in the context of a qualified privilege, is the equivalent of bad faith. It is the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Moss,* 580 A.2d at 1025. Clampitt's Complaint alleged that Ladner had specifically approved the financial and budgetary recommendations made by Plaintiff "concerning station operations" and knew that the claims of financial mismanagement reported in the press were "without foundation," but "publicly" terminated her in a manner that would lead the public to conclude that Clampitt was responsible for financial mismanagement. We think that, taken in their entirety, the assertions in the Complaint sufficiently alleged that Ladner acted in bad faith. It was not necessary, as the court's ruling implied, that the Complaint point to a "motive for self-interest" that Ladner may have had, in order to withstand Ladner's Rule 12(b)(6) motion. *See Moss,* 580 A.2d at 1028 (rejecting claim that plaintiff Stockard's showing of common law malice was insufficient as a matter of law where the evidence permitted the jury to find that university official Moss had charged Stockard with misappropriation despite his

knowledge that the characterization was inaccurate, and concluding that it was enough that Moss had "made the charge of misappropriation with, at the least, reckless indifference to its effect on Stockard's reputation").

## VII.

The trial court dismissed Clampitt's claim for payment for allegedly accrued but unused vacation time because Clampitt "did not know the basis" for the amount for which she sued and could not explain the discrepancy between the amount of accrued leave she sought in her Amended Complaint and the amount (two weeks' salary) she claimed she was due when she wrote to the University shortly after her termination.[26] The court noted the testimony by Karmiol that she believed Clampitt did not accrue leave since it was not reported on her pay stubs, and the testimony by Muha that Clampitt did not accrue vacation, but instead held a position in which the employee simply works out leave with her supervisor on an as-needed basis, and that Clampitt did not "have a bucket of leave to be paid."

Clampitt argues that the court usurped the jury's role by crediting the University's witnesses and disregarding the disputed issue of fact created by the plain language of the Manual. However, we agree with the trial court that Clampitt failed to set forth specific facts from which the jury could conclude that she was entitled to the amount she claimed. At her deposition, she could not recall how she arrived at the amount of vacation pay ($30,000) that she was suing to recover. She also stated at her deposition that the University intranet, which could be accessed to verify the amount of accrued benefits, showed as to her that accrued vacation was "not applicable." The only affirmative evidence that Clampitt cited in support of her accrued-leave claim was the statement in section 2.5 of the Senior Staff Manual. See note 26 *supra.* However, as we have concluded above, Clampitt failed to set forth facts sufficient for a jury to conclude that the terms of the Manual were an enforceable contract. In addition, Clampitt's offer letter stated that she would be entitled to "benefits for full-time staff in accordance with the university's Faculty–Staff Benefits Manual," not in accordance with the Senior Staff Manual, and the record contains no indication of what benefits the Faculty–Staff Benefits Manual described. We agree with the trial court that Clampitt failed to make a showing as to her vacation-pay claim that was sufficient to avoid summary judgment.

For the foregoing reasons, we affirm those portions of the trial court's orders dismissing Clampitt's breach of contract, tortious interference with contract, breach of the duty of good faith and fair dealing, and vacation-pay claims. We reverse those portions of the court's orders dismissing Clampitt's defamation claims against the University and Ladner, and remand for further proceedings consistent with this opinion.

*So ordered.*

---

**26.** Clampitt testified in her deposition that she was told that she was entitled to four weeks of vacation per year. She took no vacation in 2002 or 2003 and never took her full allotment in any year. She cites the provision (section 2.5) of the Senior Staff Manual stating that Senior Staff "accrue annual ... leave in full days at the rate set forth for other staff members."